**NATIONAL REALTY AND CONSTRUCTION COMPANY, INC.,**
Petitioner,

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent,**
Secretary of Labor, Party Respondent.

No. 72–1978.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 24, 1973.

Decided Dec. 13, 1973.

60. 483 F.2d at 1282.

61. *Id.* at 1280–1281.

Peter S. Latham, Washington, D. C., with whom I. H. Wachtel, Washington, D. C., was on the brief, for petitioner.

Jean A. Staudt, Atty., Dept. of Justice, with whom Walter H. Fleischer, Atty.,

Dept. of Justice, and Baruch A. Fellner and Al. J. Daniel, Jr., Attys., Dept. of Labor, were on the brief, for respondent.

Before WRIGHT and ROBB, Circuit Judges, and MATTHEWS,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

We review here an order [1] of the Occupational Safety and Health Review Commission which found National Realty and Construction Company, Inc. to have committed a "serious violation" of the "general duty clause" of the Occupational Safety and Health Act of 1970,[2] for which a civil fine of $300 was imposed.[3] Unable to locate substantial evidence[4] in the record to support the Commission's finding of a violation, we reverse.

## I. THE PROCEEDINGS AND THE EVIDENCE

The 1970 Act provides for the fining and, in aggravated cases, the imprisonment,[5] of any employer in interstate commerce who fails to eliminate avoidable hazards to the life, limb or health of his workers. Though novel in approach and sweeping in coverage,[6] the legisla-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. Decision and Order of the Occupational Safety and Health Review Commission, OSHRC Docket No. 85, Sept. 6, 1972. Review by this court is available under 29 U.S.C. § 660(a) (1970).

2. Occupational Safety and Health Act of 1970, § 2 et seq., Pub.L. 91-596, 84 Stat. 1590, 29 U.S.C. § 651 et seq. (1970). The general duty is created by § 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1). "Serious violation" is defined by § 17(k) of the Act, 29 U.S.C. § 666(j).

3. The Secretary of Labor had proposed a penalty of $800. Despite the reduction by the Commission, National Realty claims that the computation of the penalty was arbitrary and capricious. We need not reach this issue.

4. The Commission's factual findings are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a).

5. The penalty structure is set out at 29 U.S. C. § 666. While most violations of the Act, or of regulations promulgated under it, give rise only to "civil penalties," willful violations of the regulations resulting in death give rise to heavy criminal fines and possible imprisonment.

6. The Act differs from traditional workmen's compensation laws in that it penalizes maintenance of unsafe conditions rather than merely imposing tort liability for actual injuries suffered by employees. (The Act has no effect on any workmen's compensation law, see 29 U.S.C. § 653(b)(4).) Prior federal legislation imposing penalties on employers for failure to remove hazards to the health and safety of employees was limited to employers supplying the Government and to a restricted class of industries and activities. See, e. g., 30 U.S.C. §§ 801-960 (1970); 41 U.S.C. §§ 35-45 (1970). The 1970 Act applies to all persons, including corporations but excluding federal and state governments, engaged in interstate commerce. 29 U.S.C. § 652(4), (5).

tion is no more drastic than the problem it aims to meet.

The one-the-job health and safety crisis is the worst problem confronting American workers, because each year as a result of their jobs over 14,500 workers die. In only four years time, as many people have died because of their employment as have been killed in almost a decade of American involvement in Vietnam. Over two million workers are disabled annually through job-related accidents.

The economic impact of occupational accidents and diseases is overwhelming. Over $1.5 billion is wasted in lost wages, and the annual loss to the Gross National Product is over $8 billion. Ten times as many man-days are lost from job-related disabilities as from strikes * * *.

* * * [T]hese problems seem to be getting worse, not better.[7]

An employer's duties under the Act flow from two sources. First, by 29 U.S.C. § 654(a)(2), he must conform to the detailed health and safety standards promulgated by the Secretary of Labor under 29 U.S.C. § 655.[8] Second, where no promulgated standards apply,[9] he is subject to the general duty to

furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

29 U.S.C. § 654(a)(1). Breach of the general duty opens an employer to fines of up to $1,000 per violation, some fine in this range being mandatory if the violation is "serious," 29 U.S.C. § 666(b) and (c). Employer duties are enforced through citations and proposed penalties issued by the Secretary of Labor, contested matters being adjudicated by the Commission, an independent body of safety experts.[10]

On September 24, 1971 the Secretary cited National Realty for serious breach of its general duty

in that an employee was permitted to stand as a passenger on the running board of an Allis Chalmers 645 Front end loader while the loader was in motion.[11]

After National Realty filed timely notice of contest, the Secretary entered a formal complaint charging that National Realty had

permitted the existence of a condition which constituted a recognized hazard that was likely to cause death or serious physical harm to its employees. Said condition, which resulted in the death of foreman O. C. Smith, arose when Smith stood as a passenger on

7. H.R.Rep.No.91–1291, Committee on Education and Labor, 91st Cong., 2d Sess., 14–15, U.S.Code Cong. & Admin.News 1970, p. 5177 (July 9, 1970).

8. Hundreds of such standards have been promulgated. See, e. g., 29 C.F.R. §§ 1910, 1915–1919, 1923–1926 (Jan. 1, 1972). The Act authorizes the Secretary to enter into agreements with the states whereby their own standards will supersede federal regulations and state enforcement will supplant federal enforcement. 29 U.S.C. § 667. Enforcement of the general duty clause, however, will remain a federal responsibility.

9. Specific, promulgated standards preempt the general duty clause, but only with respect to hazards expressly covered by the specific standards. 29 C.F.R. § 1910.5(f).

10. The Commission is composed of three members who are appointed by the President with the advice and consent of the Senate. They must be "persons who by reason of training, education, or experience are qualified to carry out the functions of the Commission." 29 U.S.C. § 661(a).

11. In addition to referring to the general duty clause by its statute section number, the citation described the violation as follows:

On or about Sept. 16, 1971, employer did fail to provide his employee employment which was free from recognized hazards which caused and were likely to cause death or serious physical harm to his employees in that an employee was permitted to stand as a passenger on the running board of an Allis Chalmers 645 Front end loader while the loader was in motion. As the loader was proceeding down an unguarded earthen ramp, it went out of control and the employee-passenger jumped from the loader and was fatally injured when the loader rolled over on him.

the running board of a piece of construction equipment which was in motion.[12]

At an administrative hearing, held before an examiner appointed by the Commission, William Simms, the Labor Department inspector who cited National Realty, testified in person, and counsel read into the record a summary of stipulated[13] testimony by several employees of National Realty. The evidence is quickly restated.[14]

On September 16, 1971, at a motel construction site operated by National Realty in Arlington, Virginia, O. C. Smith, a foreman with the company, rode the running board of a front-end loader driven by one of his subordinates, Clyde Williams. The loader suffered a stalled engine while going down an earthen ramp into an excavation and began to swerve off the ramp. Smith jumped from the loader, but was killed when it toppled off the ramp and fell on him. John Irwin, Smith's supervisor, testified that he had not seen the accident, that Smith's safety record had been very good, that the company had a "policy" against equipment riding, and that he—Irwin—had stopped the "4 or 5" employees he had seen taking rides in the past two years. The loader's driver testified that he did not order Smith off the vehicle because Smith was his foreman; he further testified that loader riding was extremely rare at National Realty. Another company employee testified that it was contrary to company policy to ride on heavy equipment. A company supervisor said he had reprimanded violators of this policy and would fire second offenders should the occasion arise. Simms, the inspector, testifed from personal experience that the Army Corps of Engineers has a policy against equipment riding. He stated he was unaware of other instances of equipment riding at National Realty and that the company had "abated" its violation.[15] Asked to define abatement, Simms said it would consist of orally instructing equipment drivers not to allow riding.

The hearing examiner dismissed the citation, finding that National Realty had not "permitted" O. C. Smith to ride the loader, as charged in the citation and complaint. The examiner reasoned that a company did not "permit" an activity which its safety policies prohibited unless the policies were "not enforced or effective." Such constructive permission could be found only if the hazardous activity were a "practice" among employees, rather than—as here—a rare occurrence.[16] Upon reviewing the hear-

12. In its answer to the Secretary's complaint National Realty raised six "affirmative defenses," claiming (1) that its written code of safety regulations prohibited equipment riding; (2) that the deceased was a foreman and thus not an "employee" of the company; (3) that the violation was not serious; (4) that occasional equipment riding is not "within the reasonable control" of the company; (5) that, absent specific regulations, the company had "no reason to know" that equipment riding violated the Act; and (6) that the $800 penalty was excessive since the accident was caused by the misconduct of the deceased. During the hearing National Realty dropped its claim that its no-riding policy was contained in written regulations. Claim (2) is no longer asserted by the company.

13. The nature of the stipulation is somewhat murky. Both counsel conceded that the summaries read into the record accurately conveyed what the witnesses would have said if called personally. Whether the stipulation encompassed a mutual concession that the witnesses were telling the truth is less clear. At any rate, the witnesses did not contradict each other on any material factual issue, and neither counsel challenged the veracity of any of the testimony.

14. The evidence was accurately characterized by the hearing examiner, Judge Harold A. Kennedy, in Hearing Examiner's Report and Decision, Secretary of Labor v. National Realty and Construction Co., Inc., OSHRC Docket No. 85, 6–9 (Dec. 29, 1971). We have also consulted submitted portions of the transcript of the hearing.

15. The citation required that the violation be corrected "immediately." Failure to correct a cited violation by the prescribed deadline is itself a punishable violation of the Act. 29 U.S.C. § 666(d).

16. Hearing Examiner's Report and Decision, supra note 14, at 14–16.

ing record, the Commission reversed its examiner by a 2–1 vote, each commissioner writing separately.[17] Ruling for the Secretary, Commissioners Burch and Van Namee found inadequate implementation of National Realty's safety "policy." Rejecting the hearing examiner's factual findings in part,[18] Commissioner Burch stated that it was "incredible" that an oral safety policy could have reduced equipment riding to a rare occurrence.[19] Commissioner Van Namee reasoned that the Smith incident and the "4 or 5" occurrences shown on the record "put respondent on notice that more was required of it to obtain effective implementation of its safety policy." [20] The majority commissioners briefly suggested several improvements which National Realty might have effected in its safety policy: placing the policy in writing, posting no-riding signs, threatening riders with automatic discharge, and providing alternative means of transport at the construction site.[21] In dissent, Commissioner Moran concluded that the Secretary had not proved his charge that National Realty had "permitted" either equipment riding in general or the particular incident which caused Smith's death.[22]

## II. THE ISSUES

Published regulations of the Commission impose on the Secretary the burden of proving a violation of the general duty clause.[23] When the Secretary fails to produce evidence on all necessary elements of a violation, the record will—as a practical consequence—lack substantial evidence to support a Commission finding in the Secretary's favor.[24] That is the story of this case. It may well be that National Realty failed to meet its general duty under the Act, but the Secretary neglected to present evidence demonstrating in what manner the company's conduct fell short of the statutory standard. Thus the burden of proof was not carried, and substantial evidence of a violation is absent.

### A. The Relative Unimportance of the Charge

The citation and complaint stated that National Realty breached its general duty by permitting Smith to

17. Decision and Order, *supra* note 1. The opinions are by Commissioner Burch for the Commission, Commissioner Van Namee concurring and Commissioner Moran dissenting. The Commission heard no new testimony and took no new evidence.

18. We do not adopt the Judge's [*i. e.*, hearing examiner's] conclusions of law for the reasons set forth below. We do adopt the Judge's findings of fact *to the extent that they are consistent with the following*. Decision and Order, *supra* note 1, opinion of Commissioner Burch, at 1. (Emphasis added.)

19. *Id.* at 3.

20. Decision and Order, *supra* note 1, opinion of Commissioner Van Namee, at 5. Perhaps crucial to this reasoning was the Commissioner's statement that

when management [*i. e.*, Smith] violates its own safety rules, it must be concluded that management was on notice that its policy had not been effectively implemented. Indeed, it must be concluded that the policy itself had not been effectively implemented.
*Ibid.*

21. Decision and Order, *supra* note 1, opinion of Commissioner Burch, at 3; opinion of Commissioner Van Namee, at 6 n. 8. The casual nature of these proposals is evident from Commissioner Van Namee's statement:
Given the record in this case, it is inappropriate to state the specific action(s) respondent should have taken.
*Ibid.*

22. Decision and Order, *supra* note 1, opinion of Commissioner Moran, at 5. Commissioner Moran further concluded that evidence was lacking that equipment riding is a "recognized" hazard "likely to cause death or serious physical harm." *Id.* at 6–7.

23. 29 C.F.R. § 2200.33 (Jan. 1, 1972).

24. A reviewing court will typically be concerned only with the Secretary's production burden. The burden of proof presumably also includes the burden of persuading the Commission, or its hearing examiner, by a preponderance of the evidence, but a reviewing court must uphold a Commission finding supported by substantial evidence, and the Commission's view on the preponderance of the evidence is otherwise final.

ride the loader.[25] This charge was doubly unfortunate. Permission usually connotes knowing consent,[26] which is not a necessary element of a general duty violation. Second, the charge overemphasized a single incident rather than directly indicting the adequacy of National Realty's safety precautions regarding equipment riding. Nevertheless, the pleadings were not so misleading as to foreclose the Secretary from litigating the statutory sufficiency of National Realty's safety program. In the circumstances, the word "permitted" could fairly have been read to suggest merely a wrongful *failure to prevent* the Smith incident, rather than a knowing authorization of his conduct.[27] Moreover, any ambiguities surrounding the Secretary's allegations could have been cured at the hearing itself. So long as fair notice is afforded, an issue litigated at an administrative hearing may be decided by the hearing agency even though the formal pleadings did not squarely raise the issue.[28] This follows from the familiar rule that administrative pleadings are very liberally construed[29] and very easily amended.[30] The rule has particular pertinence here, for citations under the 1970 Act are drafted by non-legal personnel, acting with necessary dispatch. Enforcement of the Act would be crippled if the Secretary were inflexibly held to a narrow construction of citations issued by his inspectors.[31]

25. Commissioner Moran would require proof to conform strictly to the charge. Decision and Order, *supra* note 1, opinion of Commissioner Moran, at 3. The Commission majority paid little attention to the wording of the charge and concentrated on the terms of the general duty clause itself. *See, e. g., id.,* opinion of Commissioner Burch, at 3.

26. Webster defines the verb "permit," when used transitively, to mean
1: to consent to expressly or formally: grant leave for or the privilege of * * * 2: to give (a person) leave * * * 3 *archaic*: to give over * * * 4: to make possible * * *.
Used intransitively, the verb means
1: to give an opportunity * * * 2: ADMIT * * *.
Webster's Third New International Dictionary 1683 (Unabridged 1961).

27. As indicated in note 26 *supra,* "permit" may simply mean "to make possible" or "to give an opportunity." Thus a building may be said to permit an unobstructed view and a loose window may be said to permit entry by burglars. When the permitting agency is not a natural person, this minimal meaning is usual, for any connotations of knowing consent would be anomalous. National Realty, a corporation, is not of course a natural person. In addition, permission often means only a failure to prevent in situations where the permitting party has considerable physical or social capacity to control the permitted party. Thus a parent may be said to have "permitted" his child to play in the street even though the parent was ignorant of the child's behavior. This usage may be loose, but it is common enough. An employer, of course, enjoys vast physical authority over his employees and their workplace, a fact which Congress stressed in drafting the general duty clause. *See, e. g.,* S.Rep.No. 91–1282, 91st Cong., 2d Sess., 9 (Oct. 6, 1970), U.S.Code Cong. & Admin.News 1970, p. 5177, *and* H.R.Rep.No.91–1291, *supra* note 7, at 21.

28. NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 350, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Golden Grain Macaroni Co. v. FTC, 9 Cir., 472 F.2d 882, 885–886 (1972); L. G. Balfour Co. v. FTC, 7 Cir., 442 F.2d 1, 19, 21 (1971); Swift & Co. v. United States, 7 Cir., 393 F.2d 247 (1968).

29. Professor Davis states the rule with characteristic verve:
The most important characteristic of pleadings in the administrative process is their unimportance. And experience shows that unimportance of pleadings is a virtue. * * *
1 K. Davis, Administrative Law Treatise § 8.04 at 523 (1958). *See also* Tashof v. FTC, 141 U.S.App.D.C. 274, 437 F.2d 707 (1970).

30. NLRB v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959); NLRB v. International Union of Operating Engineers, Local 925, 5 Cir., 460 F.2d 589 (1972); NLRB v. Pallette Stone Corp., 2 Cir., 283 F.2d 641 (1960).

31. Allowing subsequent amendment of a citation's charges will not disturb the central function of the citation, which is to alert a cited employer that it must contest the Secretary's allegation or pay the proposed fine. In the typical case, the more inaccurate or unhappily drafted is a citation, the more likely an employer will be to contest it. But a citation also serves to order an employer to correct the cited condition or practice,

### B. *The Statutory Duty to Prevent Hazardous Conduct by Employees*

 Thus, despite the awkwardness of his charges and pleadings, the Secretary could properly have produced evidence at the hearing on the question whether National Realty's safety policy failed, in design or implementation, to meet the standards of the general duty clause. Under the clause, the Secretary must prove (1) that the employer failed to render its workplace "free" of a hazard which was (2) "recognized" and (3) "causing or likely to cause death or serious physical harm." The hazard here was the dangerous activity of riding heavy equipment. The record clearly contains substantial evidence to support the Commission's finding that this hazard was "recognized"[32] and "likely to cause death or serious physical harm."[33] The question then is whether National Realty rendered its construction site "free" of the hazard. In this case of first impression, the meaning of that statutory term must be settled before the sufficiency of the evidence can be assessed.

 Construing the term in the present context presents a dilemma. On the one hand, the adjective is unqualified and absolute: A workplace cannot be just "reasonably free" of a hazard, or merely as free as the average workplace in the industry.[34] On the other hand, Congress quite clearly did not intend the general duty clause to impose strict lia-

---

and a failure to so correct is a punishable violation. 29 U.S.C. § 666(d). Obviously an employer cannot be penalized for failing to correct a condition which the citation did not fairly characterize. Thus, before penalizing a failure to correct a cited violation, the Commission must satisfy itself that the citation defines the "uncorrected" violation with particularity. 29 U.S.C. § 658(a).

32. An activity may be a "recognized hazard" even if the defendant employer is ignorant of the activity's existence or its potential for harm. The term received a concise definition in a floor speech by Representative Daniels when he proposed an amendment which became the present version of the general duty clause:

> A recognized hazard is a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry. In other words, whether or not a hazard is "recognized" is a matter for objective determination; it does not depend on whether the particular employer is aware of it.

116 Cong.Rec. (Part 28) 38377 (1970). The standard would be the common knowledge of safety experts who are familiar with the circumstances of the industry or activity in question. The evidence below showed that both National Realty and the Army Corps of Engineers took equipment riding seriously enough to prohibit it as a matter of policy. Absent contrary indications, this is at least substantial evidence that equipment riding is a "recognized hazard."

33. Presumably, any given instance of equipment riding carries a less than 50% proba-

bility of serious mishap, but no such mathematical test would be proper in construing this element of the general duty clause. *See* Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988, 997–998 (1973). If evidence is presented that a practice could eventuate in serious physical harm upon other than a freakish or utterly implausible concurrence of circumstances, the Commission's expert determination of likelihood should be accorded considerable deference by the courts. For equipment riding, the potential for injury is indicated on the record by Smith's death and, of course, by common sense.

34. Though the Senate and House committee reports on the Act stated that the general duty clause incorporated "common law principles," the standard of care imposed by the clause was not characterized in terms of reasonableness. Rather, the reports speak of a

> general and common duty to bring *no* adverse effects to the life and health of their employees throughout the course of their employment.

H.R.Rep.No.91–1291, *supra* note 7, at 21; S.Rep.No.91–1282, *supra* note 27, at 9, U.S.Code Cong. & Admin.News, 1970, p. 5186. (Emphasis added.) Overtones of the reasonableness standard are to be found only in the Act's definition of a *serious* violation, *see* note 41 *infra*. That employers must take more than merely "reasonable" precautions for the safety of employees follows from the great control which employers exert over the conduct and working conditions of employees. *See* H.R.Rep.No.91–1291, *id.*, and S.Rep.No.91–1282, *id.*

bility: The duty was to be an achievable one.[35] Congress' language is consonant with its intent only where the "recognized" hazard in question *can be* totally eliminated from a workplace. A hazard consisting of conduct by employees, such as equipment riding, cannot, however, be totally eliminated. A demented, suicidal, or willfully reckless employee may on occasion circumvent the best conceived and most vigorously enforced safety regime.[36] This seeming dilemma is, however, soluble within the literal structure of the general duty clause. Congress intended to require elimination only of preventable hazards. It follows, we think, that Congress did not intend unpreventable hazards to be considered "recognized" under the clause. Though a generic form of hazardous conduct, such as equipment riding, may be "rec-ognized," unpreventable instances of it are not, and thus the possibility of their occurrence at a workplace is not inconsistent with the workplace being "free" of recognized hazards.

Though resistant to precise definition, the criterion of preventability draws content from the informed judgment of safety experts. Hazardous conduct is not preventable if it is so idiosyncratic and implausible in motive or means that conscientious experts, familiar with the industry, would not take it into account in prescribing a safety program. Nor is misconduct preventable if its elimination would require methods of hiring, training, monitoring, or sanctioning workers which are either so untested or so expensive that safety experts would substantially concur in thinking the methods infeasible.[37] All

---

35. The Act's purpose is "to assure *so far as possible* every working man and woman in the Nation safe and healthful working conditions * * *." 29 U.S.C. § 651. (Emphasis added.) The House committee report, dealing with an earlier but not pertinently distinct version of the general duty clause, stated:

> An employer's duty under Section 5(1) is not an absolute one. It is the Committee's intent that an employer exercise care to furnish a safe and healthful place to work and to provide safe tools and equipment. This is not a vague duty, but is protection of the worker from preventable dangers.

H.R.Rep.No.91–1291, *supra* note 7, at 21. These persuasive indications aside, the very word duty implies an obligation capable of achievement. *See* Restatement (Second) of Torts § 4 (1965).

36. This is not to say that an employer's statutory responsibility for a hazard vanishes, or is even diminished, because the hazard was directly caused by an employee. The Act provides "that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions." 29 U.S.C. § 651(b)(2). An employer has a duty to prevent and suppress hazardous conduct by employees, and this duty is not qualified by such common law doctrines as assumption of risk, contributory negligence, or comparative negligence.

The committee does not intend the employee-duty [to comply with the occupa-tional safety and health standards promulgated under the Act] provided in section 5(b) to diminish in anyway [*sic*] the employer's compliance responsibilities or his responsibility to assure compliance by his own employees. Final responsibility for compliance with the requirements of this act remains with the employer.

S.Rep.No.91–1282, *supra* note 27, at 10–11, U.S.Code Cong. & Admin.News, 1970, p. 5187. The employer's duty is, however, qualified by the simple requirement that it be achievable and not be a mere vehicle for strict liability.

37. This is not to say that a safety precaution must find general usage in an industry before its absence gives rise to a general duty violation. The question is whether a precaution is recognized by safety experts as feasible, not whether the precaution's use has become customary. Similarly, a precaution does not become infeasible merely because it is expensive. But if adoption of the precaution would clearly threaten the economic viability of the employer, the Secretary should propose the precaution by way of promulgated regulations, subject to advance industry comment, rather than through adventurous enforcement of the general duty clause. Finally, in an abundance of caution we emphasize that an instance of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous character, at the moment of its occurrence. Conceivably, such conduct might have been precluded through feasible precautions concerning the

preventable forms and instances of hazardous conduct must, however, be entirely excluded from the workplace. To establish a violation of the general duty clause, hazardous conduct need not actually have occurred, for a safety program's feasibly curable inadequacies may sometimes be demonstrated before employees have acted dangerously. At the same time, however, actual occurrence of hazardous conduct is not, by itself, sufficient evidence of a violation, even when the conduct has led to injury. The record must additionally indicate that demonstrably feasible measures would have materially reduced the likelihood that such misconduct would have occurred.

## C. Deficiencies in This Record

 The hearing record shows several incidents of equipment riding, including the Smith episode where a foreman broke a safety policy he was charged with enforcing.[38] It seems quite unlikely that these were unpreventable instances of hazardous conduct. But the hearing record is barren of evidence describing, and demonstrating the feasibility and likely utility of, the particular measures which National Realty should have taken to improve its safety policy. Having the burden of proof, the Secretary must be charged with these evidentiary deficiencies.

 The Commission sought to cure these deficiencies *sua sponte* by speculating about what National Realty could have done to upgrade its safety program.[39] These suggestions, while not unattractive, came too late in the proceedings. An employer is unfairly deprived of an opportunity to cross-examine or to present rebuttal evidence and testimony when it learns the exact nature of its alleged violation only after the hearing. As noted above, the Secretary has considerable scope before and during a hearing to alter his pleadings and legal theories. But the Commission cannot make these alterations itself in the face of an empty record.[40] To merit judicial deference, the Commission's expertise must operate upon, not seek to replace, record evidence.

hiring, training, and sanctioning of employees.

38. The hearing examiner thought that National Realty owed its supervisory personnel a lesser duty of care than was owed to rank-and-file employees. Hearing Examiner's Report and Decision, *supra* note 14, at 12. This involves a double misconception. Because the behavior of supervisory personnel sets an example at the workplace, an employer has—if anything—a *heightened* duty to ensure the proper conduct of such personnel. Second, the fact that a foreman would feel free to breach a company safety policy is strong evidence that implementation of the policy was lax.

39. *See* note 21 *supra*. If these suggestions emanated from the Secretary's counsel at the hearing, the record does not show it. No evidence supporting the proposals was introduced.

40. It is patently unfair for an agency to decide a case on a legal theory or set of facts which was not presented at the hearing. *See* Bendix Corp. v. FTC, 6 Cir., 450 F.2d 534, 542 (1971); Rodale Press, Inc. v. FTC, 132 U.S.App.D.C. 317, 407 F.2d 1252

(1968). The Commission suggested that National Realty should have posted "no-riding" signs or reduced its safety policy to writing, but the Secretary introduced no testimony indicating the value of such precautions relative to "orally" disseminated safety policies. The Commission suggested that National Realty should have provided alternative means of transporation in the construction site, but the Secretary introduced no evidence indicating the feasibility and probable value of doing so. The Commission suggested that National Realty should have instructed drivers not to allow riders on their vehicles, but the Secretary introduced *no evidence that National Realty had failed to issue such instructions,* or that National Realty's instructions were less frequent or forceful than experts regard as necessary to a sound safety program. The Commission suggested that riders and drivers involved in riding incidents should have been discharged, but the Secretary neither suggested this sanction nor offered testimony on its appropriateness or probable utility. In short, the Commissioners attempted to serve as expert witnesses for the Secretary. This is not their role. The Secretary should have called his own expert or experts at the hearing.

■■■ Only by requiring the Secretary, at the hearing, to formulate and defend *his own* theory of what a cited defendant should have done can the Commission and the courts assure even-handed enforcement of the general duty clause.[41] Because employers have a general duty to do virtually everything possible to prevent and repress hazardous conduct by employees, violations exist almost everywhere, and the Secretary has an awesomely broad discretion in selecting defendants and in proposing penalties. To assure that citations issue only upon careful deliberation, the Secretary must be constrained to specify the particular steps a cited employer should have taken to avoid citation, and to demonstrate the feasibility and likely utility of those measures.

■■ Because the Secretary did not shoulder his burden of proof, the record lacks substantial evidence of a violation, and the Commission's decision and order are, therefore,

Reversed.

41. Such precautions will not, of course, make the broad commands of the general duty clause any more precise and clear to *prospective* violators of the clause. But any statute or rule of law imposing general obligations raises certain problems of fair notice. Since this case arose, the Secretary has promulgated some specific regulations governing the safety precautions to be used by the construction industry. 29 C.F.R. § 1926. With respect to the general duty clause itself, the Commission can ameliorate the fair notice problem by attending carefully to the statutory definition of a "serious violation":

> [A] serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

29 U.S.C. § 666(j). When the hazard involved is a form of hazardous conduct by

employees, an employer's safety program is in "serious" violation of the general duty clause only if (1) the misconduct involves a substantial risk of harm and is substantially probable under the employer's regime of safety precautions, or (2) the employer, with the exercise of reasonable diligence, could have known that its safety program failed the standards of the clause by failing to preclude the occurrence of preventable misconduct. If either condition applies, it is hardly unfair for the Commission to assume that the defendant-employer had at least constructive notice that the law required more than was being done. Only if a violation is serious is a penalty necessarily imposed. *Compare* 29 U.S.C. § 666(b) *with* 29 U.S.C. § 666(c). While the Commission has the clear authority to impose a penalty even if the violation is not serious, a zero penalty, coupled with an abatement order, would obviously be the proper response where the Commission determined that the defendant-employer had no notice, *i. e.*, no duty to know, that its safety regime was defective.

Given our disposition of this case, there is no occasion to decide if National Realty's violation, properly proved, would be "serious."