576 F.2d 72
 6 O.S.H. Cas.(BNA) 1781, 1978 O.S.H.D. (CCH) P 22,855
FLOYD S. PIKE ELECTRICAL CONTRACTOR, INC., Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and United
States Department of Labor, Respondents.
 No. 77-1659.
 United States Court of Appeals,
Fifth Circuit.
 July 10, 1978.
 
 William H. McElwee, III, North Wilkesboro, N. C., for petitioner.
 Karen E. S. Bray, Atty., Dept. of Labor, Carin Ann Clauss, Sol. of Labor, Benjamin W. Mintz, Assoc. Sol., U. S. Dept. of Labor, Ray H. Darling, Jr., Executive Secy., OSHRC, Washington, D. C., Michael H. Levin, App. Sect. Litigation, Allen H. Feldman, Asst. Counsel, Dept. of Labor, Washington, D. C., for respondents.
 Petition for Review of an Order of the Occupational Safety and Health Review Commission.
 Before GOLDBERG, GODBOLD and SIMPSON, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Petitioner Floyd S. Pike Electrical Contractor, Inc. (Pike) seeks review of a decision of the Occupational Safety and Health Review Commission (Commission) reversing the decision of the administrative law judge and holding that Pike had violated § 5(a)(2) of the Occupational Safety and Health Act (OSHA) of 1970, 29 U.S.C. § 654(a)(2), by failing to comply with an OSHA standard governing the shoring of trenches.
 
 
 2
 Petitioner is a large electrical contracting company. During the latter part of 1974 and the first part of 1975, Pike was involved in a construction project in Augusta, Georgia which required it to open a trench in soft ground. The trench was from ten to twelve feet deep.
 
 
 3
 On January 20, 1975, an unshored portion of the trench caved in, killing Frank Riddle Sr., working foreman of the five-man crew then engaged in shoring the trench. Frank Riddle Jr., also in the unshored portion of the trench at the time of the cave-in, escaped injury. So far as the record reflects, none of the other workmen was standing in the unshored portion of the ditch at the time of the accident.
 
 
 4
 The Commission held that Pike's failure to prevent employees from working in an unshored portion of the trench violated 29 C.F.R. § 1926.652(b) which provides:
 
 Specific Trenching Requirements
 
 5
 (b) Sides of trenches in unstable or soft material, 5 feet or more in depth, shall be shored, sheeted, braced, sloped or otherwise supported by means of sufficient strength to protect the employees working within them.
 
 
 6
 A penalty of $800 was assessed. Pike contends that the Commission's decision places an employer in a "Catch-22" situation of having to violate the regulation in order to comply with it. Pike also argues that the decision impermissibly penalizes the company for the unpreventable misconduct of its employees. Evaluation of these contentions requires careful analysis of the record, a task to which we now turn.
 
 I.
 
 7
 The Commission described the shoring operation at the Augusta site as follows:
 
 
 8
 The shoring procedure that respondent (Pike) maintains was to be followed by its employees was for a boom truck to lower four-foot by eight-foot sections of three-quarter inch plywood into the trench where they would be set into place by two employees who were in the trench. After nailing two-by-fours across the middle of the plywood, the employees were to lean out into the unshored area while remaining in a shored area and hold the plywood in place on the opposing walls of the trench until a jack was placed between the plywood sections.
 
 
 9
 Thus, the company's own evidence, accepted by the Commission, showed that there was a method of installing shoring which did not require workers to stand in the unshored portion of the trench.[1] At the moment of the cave-in, however, employees Riddle Sr. and Riddle Jr. were standing some two feet beyond the shored area and were leaning against the newly placed plywood sections to keep them from falling before a jack was received and installed.
 
 
 10
 Frank Riddle Jr. testified for the Secretary. He stated that he had never been instructed in the proper method of shoring nor warned about the hazards of standing in the unshored portion of the trench. He further testified that he had no prior experience installing shoring and divided his time at the site between working in the trench and driving a truck. His father, the working foreman in the trench, also had no prior experience installing shoring. Mr. Riddle also testified that the project foreman, Mr. Riggs, did not inspect the shoring operation while Riddle was present.
 
 
 11
 Mike Blackmon, area supervisor for Pike, testified that he visited the Augusta site three days of every five. On one visit in mid-November, two or three weeks prior to beginning excavation of the trench, Mike Blackmon met with Riggs and Riddle Sr. to discuss the best method of shoring the trench. After rejecting an alternative method, the three men decided to proceed section-by-section as described above. Blackmon testified that on subsequent visits he observed Riddle Sr. engaged in shoring the trench. On one such occasion, Blackmon saw Riddle Sr. working in the unshored portion of the ditch. He called Riddle Sr. out of the trench and privately reiterated that no one was to go into the unshored area. No disciplinary sanctions apart from this mild reprimand were imposed. Blackmon stated that he knew of no occasion subsequent to this when Riddle had entered the unshored portion of the trench. Blackmon did not inform the other members of the crew that Riddle Sr. had been reprimanded for a violation of company safety rules. Nor, so far as the record reflects, did he instruct them not to go into the unshored portion of the trench. Although he was present at the Augusta site three of five days a week, his time there was divided between supervising the shoring operation and supervising a manhole excavation.
 
 
 12
 Zack Blackmon, vice-president of the company, stated that he visited the Augusta site once a month. On January 15th, he visited the site and spoke briefly to Riddle Sr. He was "pleased with Mr. Riddle's knowledge of what he was doing" and, on the basis of prior experience, considered him to be "a safe and good working foreman." Vice-President Blackmon testified that he began his conversation with Riddle Sr. by asking the foreman to describe the shoring procedure used by Riddle's crew. Riddle answered that the men leaned forward from the shored portion of the trench while installing the jacks. Blackmon reiterated that at no time was Riddle to enter the unshored portion of the trench. Zack Blackmon had no knowledge of any occasion on which Riddle or members of his crew ventured into the unshored area.
 
 
 13
 The final witness before the administrative law judge was Ralph Jordan, another member of the trench shoring crew. Jordan testified that he knew the correct method of shoring, but there was no evidence that he had been trained in this method. He stated that he, Riddle Sr., and Riddle Jr. had all stepped into the unshored portion of the trench on an unspecified number of occasions prior to the January 20th accident. There is no evidence that disciplinary action was taken against Jordan or Riddle Jr. for this behavior.
 
 
 14
 It was stipulated that every Pike employee, including Riddle Sr., received a copy of the company's safety manual. Every employee was instructed to familiarize himself with the manual and to observe all safety rules. Foremen were charged with the responsibility of insuring that all safety rules were followed and were to correct any employee violating the rules. Specific sanctions for violation of each safety rule were set forth at the end of the manual.[2]
 
 
 15
 Foremen were to be disciplined for failure to see to it that all safety rules were observed by workmen under their supervision.
 
 II. The Applicability of the OSHA Standard
 
 16
 Throughout this litigation, Pike has contested the applicability of 29 C.F.R. § 1926.652(b) to the operation of installing shoring in a trench. The regulation requires that the sides of trenches be "shored . . . or otherwise supported by means of sufficient strength to protect the employees working within them." Pike contends that the Commission's interpretation of the regulation puts an employer in an impossible situation: he must violate the regulation in order to comply with it. Additionally, Pike points out that the regulation requires shoring, but does not specify any particular method of installing it.
 
 
 17
 The Commission rejected Pike's argument by a vote of 2-1, Commissioner Moran dissenting.[3] The Commission accepted the Secretary's interpretation of the standard:
 
 
 18
 By its plain terms, the standard applies when employees are working in trenches of unstable or soft material. There is no express limitation as to the type of work being performed which may be extending the shoring itself, and none is implied.
 
 
 19
 We agree. In the first instance, we note that the Secretary's interpretation of an OSHA regulation is entitled to great deference. "We have held that the promulgator's interpretation is controlling as long as it is one of several reasonable interpretations, although it may not appear as reasonable as some other." Brennan v. Southern Contractors Service, 492 F.2d 498, 501 (5th Cir. 1974).[4]
 
 
 20
 The Secretary's interpretation of the shoring standard is certainly a reasonable one. There is no dispute between the parties that shoring can be accomplished without exposing employees to the hazards of working in the unshored portions of the trench.[5] The Secretary's interpretation of the regulation thus prevents the employer from needlessly exposing the employees to the very risk which the regulation is designed to minimize. The Secretary's interpretation is thus consonant with the overall purpose of OSHA, prevention of all preventable work-related accidents, see Horne Plumbing and Heating Co. v. OSHRC, 528 F.2d 564, 571 (5th Cir. 1976), and with specific purposes of the shoring regulation. In contrast, the interpretation urged by Pike, "rather than eliciting greater responsiveness on the part of employers would condone greater neglect." Brennan v. Southern Contractors Service, supra, 492 F.2d at 501.
 
 III. Pike's Violation of the Regulation
 
 21
 Pike contends that the Commission's decision amounts to the imposition of strict liability upon an employer for the unpreventable acts of its employees. Relying on Horne Plumbing supra, Pike insists that it cannot be held responsible for its employees' misconduct where that misconduct was "unforeseeable, implausible, and therefore unpreventable . . .." 528 F.2d at 571.
 
 
 22
 As a general proposition, Pike's contention is unobjectionable. however,
 
 
 23
 . . . if an employee is negligent or creates a violation of a safety standard, that does not necessarily prevent the employer from being held responsible for the violation. . . . True, an employer is not an insurer under the Act. But an employer is responsible if it knew or, with the exercise of reasonable diligence, should have known of the existence of a serious violation. A particular instance "of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous nature, at the moment of its occurrence, . . . (where) such conduct might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees.
 
 
 24
 Brennan v. Butler Lime and Cement Co., 520 F.2d 1011, 1017 (7th Cir. 1975), quoting National Realty and Construction Co. v. O.S.H.R.C., 160 U.S.App.D.C. 133, 142-43, 489 F.2d 1257, 1266-67 n. 37. (Citations omitted.) (Emphasis in original.) This approach to employee misconduct has been adopted in this circuit as well. Horne Plumbing, supra, 528 F.2d at 568-69. Applying this standard to the facts of the case at bar, we find the evidence ample to support the Commission's ultimate conclusion.
 
 
 25
 While it is undisputed that Riddle Sr. and Ralph Jordan were instructed not to enter the unshored portion of the trench, the evidence is also undisputed that Riddle Jr. never received such instructions. Neither Riddle Sr. nor Riddle Jr. had any prior experience shoring trenches. Moreover, the evidence showed that all three men had entered the unshored portions of the trench on several occasions. No disciplinary action was ever taken against Jordan or Riddle Jr. Riddle Sr. did receive a mild private reprimand on one occasion when he was observed in the unshored portion of the trench. The company, however, made no effort at that time to ascertain whether other employees had been violating the rule. There is no evidence, moreover, that the company, even after learning of Riddle Sr.'s disregard of the rule, made any additional effort to instruct the men in the correct method of installing shoring. In view of the working foreman's obligation not only to observe the rules, but to insure that the rules were observed by his men, the company's failure to make any further inquiry or take any further corrective action is particularly significant.
 
 
 26
 Because the behavior of supervisory personnel sets an example at the workplace, an employer has if anything a heightened duty to ensure the proper conduct of such personnel. Second, the fact that a foreman would feel free to breach a company safety policy is strong evidence that implementation of the policy was lax.
 
 
 27
 National Realty and Construction Co., Inc. v. O.S.H.R.A.C., 160 U.S.App.D.C. 133, 143, 489 F.2d 1257, 1267 n. 38 (1973). While OSHA does not require an employer to inscribe a safety regulation on parchment or chisel it in stone, neither does it permit him to treat the rule as if it were written in sand.
 
 
 28
 The contrast to Horne Plumbing is instructive. There two workmen were killed when the unshored portion of trench collapsed upon them. Both men "understood Mr. Horne's safety instructions; they were trained and highly experienced in the use of shoring; and they had always used shoring properly in previous jobs, including one immediately preceding the Chamblee excavation." 528 F.2d at 566-67. The men had received specific instructions not to work in the unshored portion of the ditch; they disregarded not only these instructions but the continued warnings of fellow employees. The company's safety program was concededly an outstanding one for a small employer. In short, Mr. Horne, the company president, "did everything within his power to insure compliance with the law, short of remaining at the job site and directing the operations himself." Id. at 569. Requiring Mr. Horne personally to direct the operation would be "wholly unnecessary, unreasonable, and infeasible."
 
 
 29
 Here an inexperienced working foreman was put in charge of an inexperienced crew, at least one of whose members never had received any instruction in the safe method of shoring a trench. The company's training and safety program, rather than producing an atmosphere in which ordinary employees would warn foremen of imminent risks, was inadequate to prevent crew members from following their foreman's poor example. Even after learning that the foreman himself did not scrupulously observe the injunction against venturing into the unshored area of the trench, the company made no additional effort to insure that the rule was understood by the men and enforced by the foreman. In reaching this result, we do not trench upon common sense or require Pike to adopt "measures beyond those which are reasonable and feasible;" on the contrary, our decision encourages employers to take relatively simple and inexpensive steps to insure compliance with the shoring standard.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 The Secretary's expert witness agreed that the method of shoring described was an "adequate method."
 
 
 [2]
 One of the "Basic Rules for Underground Work" provided:
 
 
 [1]
 Proper safety procedures shall be followed when excavating. When necessary for personnel to work below ground level, proper shoring or sloping of walls must be exercised when working in unstable earth materials
 The section of the manual setting forth penalties for violation of each of the forty "Safety Rules" lacks any reference to this rule. Since the record is inadequately developed on the relationship between the "Safety Rules" and the "Basic Rules" and since the Commission did not rely on this omission in the manual, we do not attach great significance either to the existence of the "Basic Rule" or to failure to specify sanctions for its violation.
 
 
 [3]
 The peak of Pike's success with this argument was, therefore, the administrative judge's decision in favor of the company
 
 
 [4]
 In Southern Contractors, we overturned a decision of the Commission rejecting the Secretary's interpretation of the regulation there at issue. Here, of course, the Secretary and the Commission agree and the company, correspondingly, bears a heavier burden in demonstrating that the Secretary's interpretation is unreasonable. See Clarkson Constr. Co. v. OSHRC, 531 F.2d 451, 457 (10th Cir. 1976) ("Where two administrative bodies having expertise arrive at similar interpretations, a court should be slow to impose its own interpretation.")
 
 
 [5]
 We reiterate that the case at bar does not involve the applicability of the standard to installation of the first section of shoring. Trenches do not come into the world equipped with shoring, and it may be technically impossible to brace the first section of shoring without entering the trench. Only in that event would the company have "to violate the law in order to comply with it." Here, of course, Pike's own evidence, accepted by the Commission, demonstrates that Riddle Sr. could have shored the next section of the trench without leaving the safety of the already-shored area