**EVERGLADES SUGAR REFINERY, INC., Petitioner,**

v.

**Raymond J. DONOVAN, Secretary of Labor, and Occupational Safety & Health Review Commission, Respondents.**

No. 79–2441.

United States Court of Appeals, Fifth Circuit.* 
Unit B

Oct. 15, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Constangy, Brooks & Smith, Charles A. Edwards, Atlanta, Ga., for petitioner.

Marleigh Dover Lang, Ronald R. Glancz, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., Laura V. Fargas, Allen H. Feldman, U.S. Dept. of Labor, Washington, D.C., for respondents.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Petitioner Everglades Sugar Refinery, Inc. (the "company"), seeks review of an order of the Occupational Safety and Health Review Commission (the "Commission") that the company committed a serious violation [1] of Section 5(a)(2) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(2), and a regulation promulgated thereunder, 29 C.F.R. 1910.-178(q)(1),[2] by permitting an unauthorized employee to repair a broken throttle linkage on an International Harvester payloader. This court has jurisdiction to consider the petition pursuant to 29 U.S.C. § 660(a), which states that "[a]ny person adversely affected . . . by an order of the Commission . . . may obtain a review of such order in any United States court of appeals for the

---

**1.** The Act defines "serious violation" at 29 U.S.C. § 666(j):

For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

**2.** 29 C.F.R. 1910.178(q)(1) provides:

Any power-operated industrial truck not in safe operating condition shall be removed from service. All repairs shall be made by authorized personnel.

circuit in which the violation is alleged to have occurred," the alleged violation in this case having occurred in Clewiston, Florida.

The Secretary of Labor issued a citation in June, 1976, to Everglades finding a violation of Section 5(a)(1), the so-called "general duty clause," and Section 5(a)(2), for the breach of specific standards promulgated thereunder.[3] The company timely contested the citation, and the case was assigned to an Administrative Law Judge who, after conducting a full hearing, vacated both the Section 5(a)(1) and Section 5(a)(2) violations on February 7, 1977. The Secretary then petitioned for review to the full Commission which affirmed the Administrative Law Judge in every respect except that the Commission found that the company had violated 29 C.F.R. 1910.178(q)(1), and accordingly Section 5(a)(2). The company now contests the remaining citation, and we affirm.

## I. THE FACTS

The relevant facts are in the main undisputed. Everglades Sugar Refinery, a subsidiary of Savannah Foods and Industries, Inc., engages in the refining, packaging, and shipping of cane sugar. It employs 42 people at its Clewiston, Florida, plant, most of whom are engaged in sugar processing operations. While a majority of the maintenance and cleanup tasks are contracted out to an independent contractor, Blackwell Welding Company, some Everglades employees also perform maintenance and cleanup tasks on the weekends. It was during such a weekend maintenance operation that the alleged violation occurred that resulted in the death of Everglades employee Ricky Carter.

On Saturday, May 8, 1976, Ricky Carter and Ronnie Sauls were engaged in routine maintenance operations. As part of their assigned duties, Carter and Sauls were ex-

pected to complete a task known as cleaning "mud," a filtering agent, from Everglades' syrup presses. Although it was possible to accomplish this by use of a small pickup truck and shovels, the employees could save a substantial amount of time and eliminate considerable manual labor by using a piece of Everglades' equipment drawn from the rolling stock.

Everglades owned several pieces of industrial equipment, among them an International Harvester Model H–25 small payloader, which had a front-end hydraulically operated bucket. Three or four days earlier, on May 4, the small payloader's throttle linkage had become disconnected, and as a result the machine would only idle. The linkage, which connected the accelerator to the carburetor, would have to have been reconnected in order to permit movement of any sort, including operation of the front hydraulic bucket.

As a result of this malfunction, Everglades' shift supervisor, Raleigh Dyess, determined that the payloader should be repaired by an outside contractor. As supervisor Dyess testified, "[w]hen it was reported to me that it was malfunctioning, I told the men that normally use it on cleanup purposes to leave it parked and don't mess with it, and I'd have it fixed when the man came that regularly services the forklifts."

In anticipation of the repair the payloader was parked in its regular place under a canopy at the edge of the refinery with its bucket lowered. No sign or tag was placed on the machine indicating that the throttle linkage was broken, and the keys to the ignition were left in place.

Supervisor Dyess believed that he had informed every employee who would have reason to use the payloader that the throttle linkage was disconnected and the machine should be left alone. Nevertheless,

---

**3.** Sections 5(a)(1) and (2), 29 U.S.C. §§ 654(a)(1) and (2) provide:

Each employer—
(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or

serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this chapter.

The company was originally cited for seven separate violations of standards promulgated in the Code of Federal Regulations.

sometime between May 4, when the linkage broke, and May 8, when Carter was killed, Dyess discovered that two other cleanup men were trying to repair the machine. Dyess did not, however, reprimand either man nor did he remove the keys at this point. The supervisor simply told the men to leave the machine alone.

On May 8, a Saturday, Ricky Carter and Ronnie Sauls reported for work as part of the weekend cleaning operation shift. Neither of these men had been informed that the linkage was defective and that the machine was to be left alone, although both Carter and Sauls had previously used the small payloader to aid them in their cleanup operations and to avoid the strenuous labor of shoveling "mud" by hand. Carter learned of the defective linkage by chance when another employee mentioned it to him. Carter and Sauls examined the payloader and concluded that it would be possible to repair. Because of the disconnected throttle linkage, the payloader could not be moved, and therefore its bucket could be raised only by manually operating the throttle to race the engine. Using this method to raise the bucket, Carter and Sauls placed a steel rod through the "scissors" of the boom mechanism to prevent the bucket from falling and reconnected the linkage by crawling under the raised bucket which at the time contained almost 300 pounds of bone char. When they attempted to move the payloader, however, the linkage again fell apart, and Carter and Sauls were forced to repeat the process. On their second attempt, Carter and Sauls forgot to reinsert the steel rod in the "scissors." While Carter was standing under the bucket Sauls again raced the engine by manually operating the throttle. Apparently, Sauls bumped the boom release while racing the throttle, and the bucket fell on Carter and killed him.

## II. ISSUES PRESENTED

In the review of this case it is first necessary for us to determine if the evidence supports the Commission's findings of fact

4. *See* footnote 1, *supra.*

that Carter was not authorized to make the repair to the payloader. The Commission determined that the repair was not "made by authorized personnel." If we concur in that finding, we must then decide whether the Commission's interpretation of Section 1910.178(q)(1) permits the legal conclusion that, under these facts, subsection (q)(1) was violated by the employer. If we agree that the Commission is correct and that the facts support such a legal interpretation of the regulation, we then have to determine if the accident was foreseeable and thus a serious violation within the meaning of 29 U.S.C. § 666(j).[4]

## III. DISCUSSION.

### A. The Finding of Fact.

The court of appeals is limited in the scope of review of an order of the Occupational Safety and Health Review Commission to a consideration of whether the Commission's findings are supported by substantial evidence. As this court stated in *Accu-Namics, Inc. v. Occupational Safety and Health Review Commission*, 515 F.2d 828, 835 (5th Cir. 1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed. 752 (1976):

Reviewing courts are bound to apply the substantial evidence test to the Commission's findings of fact. . . . If there is substantial evidence in the record to support the finding of a serious violation, the order must be affirmed. [Citations omitted.]

The company's primary contention is that the citation should be vacated because the repair of the accelerator linkage was a relatively "minor" repair which the deceased employee, Ricky Carter, was competent and thus authorized to perform. The argument is that 29 C.F.R. 1910.178(q)(1) would have no applicability if an employee were injured while performing a minor repair which did not present any inherent threat to that employee's safety. This first contention presents a factual determination of whether the repair of the linkage was "made by authorized personnel."

In support of the first argument, considerable record testimony was introduced during the hearing before the Administrative Law Judge aimed at describing the company's safety policies. That testimony demonstrated that the company followed a two-echelon policy regarding the repair of machinery at the plant. Those repairs which were categorized as "first-echelon" were those which employees could routinely perform, such as jumping a battery on a stalled piece of machinery or changing a spark plug. The company contends that the repair of the throttle linkage was itself such a minor first-echelon repair which presented no inherent safety risk. As the company stated its position before the Administrative Law Judge, "[i]t is the Respondent's [herein petitioner's] position that as far as the specific standards are concerned, the defect concerned must be one which renders the vehicle unsafe." Stated another way, the company contends that a violation of 29 C.F.R. 1910.178(q)(1) would only occur where the inherently dangerous nature of the repair was the *cause* of the injury which resulted. Since the repair here was not inherently dangerous and since Carter apparently knew how to repair the throttle linkage, the company argues that Carter's death was caused solely by his negligence in working under the raised and loaded bucket. The company then contends that the citation should be vacated because there was no violation of the regulation because Carter was authorized to repair the linkage since this was a minor or first-echelon repair.

The Secretary, on the other hand, contends that the gravamen of the offense was the fact that Ricky Carter was not properly *authorized* to make the repair. Whether Carter knew what he was doing or not (and the fact that Carter was able to connect the linkage only moments before his death suggests that he did, although he did not appreciate the danger involved), Carter would not have been killed if the company had adequately insured that an independent outside contractor made the repair. The Secretary therefore contends that the company is estopped from urging that Carter

should have known what he was doing because of the company's own *decision to have* the vehicle repaired by an outside contractor. Had the company fulfilled its responsibility by informing each employee to leave the payloader alone, Carter would not have been killed. The Secretary contends that regardless of whether the repair of a throttle linkage posed an inherent safety risk, which in some sense *caused* Carter's death, the company is nevertheless liable because it permitted an unauthorized employee to make a repair during the course of which that employee was killed.

The company nowhere contests the fact that the payloader had not been tagged in such a manner to insure that it was left alone by Everglades' employees. Furthermore, the company's own witness testified that the keys were left in the payloader's ignition despite the fact that "[w]e have found if [we] just pull the keys then they [employees] know there is something wrong with it and it is not to be used." Similarly, Dyess conceded in response to the question "[w]hat prevented you from at that time pulling the keys?":

> A: I've never done that. It was an error on my part, I guess, because, like I say, only just four or five men used it usually.

We agree with the factual conclusion of the Commission that Carter was not authorized to perform the repair of the linkage in the payloader. It is apparent that the company did not want him to repair it and it thus must follow that he was not authorized to do so.

B. The Interpretation of the Regulation.

The company argues that subsection (q)(1) does not permit a conclusion that these facts support or authorize a finding of a violation. For convenience's sake, we will repeat the regulation.

> Any power-operated industrial truck not in safe operating condition shall be removed from service. All repairs shall be made by authorized personnel.

29 C.F.R. 1910.178(q)(1). Everglades argues that this subsection applies only to industri-

al trucks not in safe operating condition and then argues that there was nothing unsafe about the payloader in its state of disrepair at the time of the accident. They point out that the motor would only operate at an idling rate and could not be accelerated and thus was not unsafe. The company then contends that the entire subsection applies only to unsafe trucks and that the second sentence with respect to repairs would be applicable only to unsafe trucks. The Secretary has interpreted the second sentence of the subsection to apply to the repair of all power-operated trucks, whether or not the truck is in a safe or unsafe condition when the repair commences. The Secretary interprets the subsection to mean that a repair made by unauthorized personnel on an inoperable industrial truck constitutes a violation without the truck being initially in an unsafe operating condition, provided the attempted repair may result in creating an unsafe condition.

■ We are persuaded that the Secretary's interpretation of its own regulation should be upheld on appeal. In *Floyd S. Pike Electrical Contractor, Inc. v. Occupational Safety & Health Review Commission*, 576 F.2d 72 (5th Cir. 1978), this circuit upheld the decision of the Commission finding the company to have violated an OSHA standard governing the shoring of trenches. In so holding, the court emphasized that:

> [T]he Secretary's interpretation of an OSHA regulation is entitled to great deference. "We have held that the promulgator's interpretation is controlling as long as it is one of several reasonable interpretations, although it may not appear as reasonable as some other." *Brennan v. Southern Contractors Service*, 492 F.2d 498, 501 (5th Cir. 1974).

576 F.2d at 75.

In the instant case the Secretary's interpretation of 29 C.F.R. 1910.178(q)(1) must be upheld if it is a reasonable interpretation of the regulation governing unauthorized repairs. We think that it is.

C. Was the Violation a Serious One Within the Meaning of the Statute?

The company contends a violation is a serious one if there is a substantial probability that death or serious injury could result and if the employer could not, with the exercise of reasonable diligence, foresee such a result. (As we shall later discuss, the courts have not construed the statute this narrowly.) The company then argues that the violation was not a serious one because there was not a substantial probability that death or serious injury could result from an employee's repairing the throttle linkage, and that the company could not have reasonably foreseen that death or serious injury could result because Carter's own negligence caused the injury. The company wishes to avoid its obligation to adhere to the regulations by urging upon us that the accident would not have happened but for Carter's negligence. Of course, it can equally be said that the accident would not have occurred but for the company's having left the keys of the payloader in the ignition switch instead of removing them while awaiting the outside repairman which the company intended to use for the purpose of repairing the payloader. The company cannot avoid its responsibility to adhere to the regulations because Carter himself was negligent in what he did.

■ Further, the company wishes to convince us that it could not foresee (1) that Carter and Sauls would prefer using the payloader to move the "mud" rather than using shovels and their backs, (2) that Carter would attempt to repair the throttle linkage in a position beneath the loaded bucket, and (3) that Sauls would accidentally bump the boom release causing the bucket to fall on Carter. Foreseeability is an expectation that a person experienced in the circumstances could conceive would happen. Not every eventuality must be foreseeable, nor the details. Under these circumstances, could the management conceive that an employee could injure himself in repairing the payloader? The Commission answered this in the affirmative, and we agree.

The Commission may have been influenced by the opinion of the Ninth Circuit in

*California Stevedore and Ballast Co.,* in which the court stated:

> We concede that section 17(k) [fn. 1] is artlessly and ambiguously drafted. Nevertheless, the Secretary's interpretation of the Act is not unreasonable and thus is entitled to a certain deference. *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792 [801–02], 13 L.Ed.2d 616 (1965). Congress declared its purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." OSHA § 2(b), 29 U.S.C. § 651(b). Congress clearly intended to require employers to eliminate all foreseeable and preventable hazards. *National Realty & Construction Co. v. OSHRC,* 160 U.S.App.D.C. 133, 489 F.2d 1257, 1265–67 (1973). The original Senate bill treated all violations as "serious." As finally enacted, however, OSHA incorporated a House proposal to leave discretionary penalties for violations "determined not to be of a serious nature." Conf.Rep. No. 91–1765, 1970 U.S.Code Cong. & Admin.News, p. 5237. Congress apparently decided that violation of some regulations might pose so little threat of harm that a penalty should not be mandatory. Where violation of a regulation renders an accident resulting in death or serious injury possible, however, even if not probable, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation. When human life or limb is at stake, any violation of a regulation is "serious."

*California Stevedore and Ballast Co. v. Occupational Safety and Health Review Commission,* 517 F.2d 986, 988 (9th Cir. 1975). This reasoning was specifically approved in the case of *Shaw Construction, Inc. v. Occupational Safety and Health Review Commission,* 534 F.2d 1183, 1185 (5th Cir. 1976).

We conclude that the Commission was correct in its factfinding, its interpretation of its rule, and in concluding that the employer was guilty of a serious violation.[5]

AFFIRMED.

R. LANIER ANDERSON, III, Circuit Judge, dissenting:

Respectfully, I dissent. I agree with the majority that the Commission was not clearly erroneous in finding that Ricky Carter lacked authority at the particular time to make the repair at issue. However, the majority fails to mention that the evidence in this case shows that the usual authority which employees like Ricky Carter had to make minor repairs such as the one at issue was withdrawn at the particular time for economic reasons wholly unrelated to safety. In response to the court's request at oral argument, the Secretary conceded that "the record is clear that the authorization to repair the payloader was withdrawn

---

5. The dissent makes a distinction between repairs for economic purposes and repairs that implicate safety in the following language:

> In response to the court's request at oral argument, the Secretary conceded that "the record is clear that the authorization to repair the payloader was withdrawn from Everglades' employees for economic motives." The decision of the Commission in this case assumed that *any* repairs by unauthorized personnel would necessarily implicate safety considerations. The majority opinion apparently acquiesces in that assumption.

The following language from the Commission's decision explores the basis of the Commission's determination:

> An unauthorized employee attempting a repair for which he is not properly trained is certainly exposed to dangers that authorized personnel would know to avoid. . . . Subsection (q)(1), in addition to requiring the removal of unsafe equipment from service, is addressed to assuring safe practices during the repair of equipment.

The majority does not construe the Commission's decision and we do not hold "that *any* repairs by unauthorized personnel *would* necessarily implicate safety considerations." We hold that some repairs by unauthorized personnel could implicate safety considerations. The Commission considered and the majority concurs that in this instance an unauthorized employee was permitted to make a repair which was unsafe because he was not trained to make such repairs and was killed in the process. As discussed in the opinion, the possibility of this type of activity was foreseeable and preventable. Thus we conclude that a repair made by unauthorized personnel who has not been trained to make the type of repair involved will be a safety violation when an accident such as this is possible.

from Everglades' employees for economic motives." The decision of the Commission in this case assumed that *any* repairs by unauthorized personnel would necessarily implicate safety considerations. The majority opinion apparently acquiesces in that assumption. *Supra* at 1081. In my opinion, the above-mentioned concession by the Secretary and the controlling findings of fact in this case demonstrate that the assumption indulged by the Commission and the majority is unwarranted. It is now undisputed that the decision to have the vehicle repaired by an outside independent maintenance firm, rather than by employees like Ricky Carter, was made for economy reasons unrelated to safety. Moreover, the administrative law judge found as a fact that Carter was an experienced mechanic on internal combustion engines. Although the Commission noted that Carter had not been trained to repair the particular vehicle at issue, it did not dispute the ALJ's finding that he was an experienced mechanic. Finally, the ALJ found as a fact that the repair at issue "was not, *per se*, a defect affecting 'safety' and required only minor repair." (Finding of Fact No. 4.) Except for its assumption that any repair by unauthorized personnel involves safety, which in my opinion is unwarranted on the facts of this case, the Commission did not dispute or vacate this finding of the ALJ. Although repairs by unauthorized personnel might involve safety considerations as a general rule, I conclude on the facts of this case that the repair by Ricky Carter, although he was technically unauthorized, implicated no safety consideration. In my opinion, the Commission and the majority opinion have drawn unwarranted assumptions from the controlling facts of this case. Accordingly, I dissent.