593 F.2d 637
 7 O.S.H. Cas.(BNA) 1241, 1979 O.S.H.D. (CCH) P 23,487
CHAMPLIN PETROLEUM COMPANY, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray
Marshall, Respondents.
 No. 77-2740.
 United States Court of Appeals,
Fifth Circuit.
 April 20, 1979.
 
 W. N. Woolsey, Ralph B. Weston, Corpus Christi, Tex., for petitioner.
 Ray H. Darling, Jr., OSHRC, Washington, D. C., Diane E. Burkley, Atty., Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Assoc., Allen H. Feldman, Acting Counsel, Dennis K. Kade, Asst. Counsel, U. S. Dept. of Labor, Washington, D. C., for respondents.
 Petition for Review of an Order of the Occupational Safety and Health Review Commission.
 Before GEWIN, RONEY and GEE, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 An employer appeals an order of the Occupational Safety and Health Review Commission (Commission) finding a violation of the general duty clause of the Occupational Safety and Health Act (OSHA) which obligates the employer to
 
 
 2
 furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.
 
 
 3
 29 U.S.C.A. § 654(a)(1). The recognized hazard to which employees were exposed was the escape of hot oil. The Commission's order was based on the employer's failure to prevent such exposure by effectively communicating a rule against opening valves, through which the oil might escape, unless they are equipped with handles. Because we fail to find substantial evidence on the record considered as a whole, 29 U.S.C.A. § 660(a), that either the use of handles on valves or the effective communication of a rule against opening valves without them would have materially reduced the hazard of oil fire injuries, we reverse.
 
 
 4
 A pipeline control valve malfunctioned at the Corpus Christi, Texas oil refinery of employer, Champlin Petroleum Company (Champlin). Isolation of the pipeline section and draining of its contents were necessary before the defective valve could be removed. A block valve was closed on each side of the control valve to permit the isolated crude oil, which flowed at a temperature hot enough to ignite on contact with air (auto-ignition temperature), to cool before draining through the bleeder valve. Several hours later, the unit operator, Cobb, and two maintenance employees, Benson and Bennett, prepared to bleed the control valve. Bennett stood up on the pipes a few feet to the side of the bleeder valve. Cobb stood to the right of and below the valve with the valve at waist or shoulder height. Benson stood up on the pipes on the same level as the valve. The valve had been newly installed with a handle four days before. On this occasion, however, the handle, a circle 21/2 inches in diameter, was missing. Benson reached down and opened the valve by turning the valve stem with a crescent wrench. A thin stream of oil ran into the bucket which had been suspended from the valve. Shortly thereafter, smoke emerged from the valve indicating that auto-ignitable oil would follow. Benson was unable to close the valve, and in the ensuing flash fire the three employees were injured, Cobb fatally. Foreign matter had apparently been trapped in one of the block valves, preventing it from completely closing. The pressure created by opening the bleeder valve dislodged the sediment, permitting hot oil to flow into the isolated section.
 
 
 5
 Following inspection of the refinery by an OSHA compliance officer, a citation was issued charging a general duty clause violation in that:
 
 
 6
 (a) There was no fixed handle on the bleeder valve to control the flow of liquid hydrocarbons from the line. Employees were using a pair of pliers on the valve stem since the handle was missing.
 
 
 7
 (b) Liquid hydrocarbons were not piped away from the bleeder valve located approximately 3 feet from an in service heater unit.
 
 
 8
 An $800 penalty was proposed.
 
 
 9
 The administrative law judge vacated the citation and proposed penalty, finding the hazard of exposure to auto-ignitable oil unpreventable because the employer could not have foreseen that its employee would open the valve without a handle in violation of the company's well established safety policy. Reversing the administrative law judge, the Commission affirmed the citation and penalty, concluding that the company's safety policy was ineffectively communicated to employees.
 
 
 10
 We observe that in reversing the decision of the Commission we need not and do not assess the sufficiency of support for the administrative law judge's conclusions. The relationship between the ALJ and Commission differs from that of trial and appellate courts in that OSHA contemplates that the Commission be charged with fact-finding responsibility, 29 U.S.C.A. § 659(c), and the ALJ is merely an arm of the Commission for that purpose. Accu-Namics, Inc. v. OSHRC, 515 F.2d 828, 834 (5th Cir. 1975), Cert. denied,425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). See 29 U.S.C.A. § 661(i). While the findings of the ALJ are to be considered on review and may weaken the contrary conclusion of the Commission, D. Federico Co. v. OSHRC,558 F.2d 614, 617 (1st Cir. 1977) (Coffin, C. J., concurring), we disturb the Commission's decision only because it lacks the support of substantial evidence. 29 U.S.C.A. § 660(a).
 
 
 11
 To establish a general duty clause violation, the Secretary must prove "(1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm.' " National Realty & Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 141, 489 F.2d 1257, 1265 (1973); Getty Oil Co. v. OSHRC,530 F.2d 1143, 1145 (5th Cir. 1976). The general duty obligation, however, is not designed to impose absolute liability or respondeat superior liability for employees' negligence. Rather it requires the employer to eliminate only "feasibly preventable" hazards. Getty Oil, 530 F.2d at 1145. It is the Secretary's burden to show that demonstrably feasible measures would materially reduce the likelihood that such injury as that which resulted from the cited hazard would have occurred. Titanium Metals Corp. of America v. Usery, 579 F.2d 536, 543-44 (9th Cir. 1978) (regarding fire spread by accumulations of titanium dust, Secretary's metallurgy expert testified that fires could be minimized by isolating particles as, for example, by more frequent washdowns). The Secretary must specify the particular steps the employer should have taken to avoid citation, and he must demonstrate the feasibility and likely utility of those measures. National Realty, 489 F.2d at 1268.
 
 
 12
 At the hearing it was suggested by the OSHA compliance officer that such flash fires are preventable by attaching a drain pipe to the valve so hot oil would be piped away from the area of employee exposure and by maintaining handles on bleeder valves so they may be turned off quickly when smoke appears. Where handles are missing, the compliance officer suggested, an effective training and safety program discouraging opening of handleless valves could reduce injury. The administrative law judge found that use of a drain pipe would have been infeasible under these circumstances, and the Commission, assuming that an adequate safety rule regarding handles would have abated the hazard, restricted its discussion to the effectiveness of communication of the policy against opening handleless valves.
 
 
 13
 The conflicting evidence on effectiveness of company policy communication need not be confronted in this case. The decision properly turns on the lack of evidentiary support for the underlying assumptions of both the administrative law judge and Commission that either the use of handles or the strengthened communication of the company's policy against opening valves without handles would materially reduce the hazard of injuries from auto-ignitable oil fires.
 
 
 14
 We consider first the proposed improvement of the company's communication of its rule against opening handleless valves. The effectiveness of this communication is declared by the Commission to be the critical issue in the preventability of this violation. The emphasis of the Commission is misplaced, however, in its focus on what the company has taught rather than what the employees have learned. Improved education will effectively prevent repetition of a mishap only where ignorance was at least the partial cause of that mishap.
 
 
 15
 Close scrutiny of the record reveals no evidence that any Champlin employee has ever opened or is likely ever to open a handleless valve out of ignorance that it is contrary to company-approved procedures. Benson's opening of the valve on this occasion, the only known instance in which a handleless valve has ever been opened by a Champlin employee, was clearly done with knowledge that he was following an improper and unsafe procedure. Bennett, the other maintenance employee present, testified that he had never run into a handleless bleeder valve and suggested that he would know to get the handle replaced if he noticed its absence. He recalled being taught proper valve-opening procedure while coming up through training. Pascal, a unit operator, testified that standard company procedure was to open and close only valves with handles on them. It is incumbent upon the Secretary to demonstrate exactly how the company should and could improve communication of its policy so as better to reduce auto-ignitable oil fires. Because the record reveals no proof that any employee has ever opened a handleless valve before, in ignorance or otherwise, and because no witness testified that he was unaware of the correct procedure for opening valves, we conclude that the Secretary has failed to show that louder or wider broadcasting of the company's policy would have had any material effect on the likelihood of injuries of the type sustained here.
 
 
 16
 Even if the record revealed sufficient evidence from which to conclude that improved policy communication would reduce the opening of valves without handles, the record fails to demonstrate, as it must, that the use of handles themselves would effectively reduce the hazard that caused these injuries.
 
 The administrative law judge stated
 
 17
 It does not take a conscientious expert, familiar with the refinery industry, to recognize the factor of safety provided by the presence of a handle on a bleeder valve. Its utility enables the operator to crack this valve ever so gently and if smoke is encountered from the flow the source of ignition can be halted abruptly.
 
 
 18
 The Commission too concluded that once smoke is observed, the valve "could be closed sufficiently quickly by means of the handle to prevent the hot oil from emerging." While common sense suggests that valves can be closed more quickly by use of handles, close examination of the record suggests that these conclusions are beyond the record evidence. Cf. National Realty, 489 F.2d at 1267.
 
 
 19
 The first witness, Champlin's chief supervisor, Cooper, testified that use of handles to open valves is standard company policy. He did not assert the efficacy of closing by handle in a case like this one. Rather Cooper commented that hanging the bucket from the valve instead of placing it on the deck below reduced the time available to close before flashing and speculated that the valve had been opened dangerously wide in this instance, perhaps because the valve itself was plugged. The OSHA compliance officer testified that increased maneuverability of a device with a handle is obvious, but he expressed doubt that use of a handle alone would have eliminated the hazard,
 
 
 20
 Possibly if people were quick, without the hose there, if they were quick enough they might be able to control it. Who is to say, but at what point you are going to have a bleeder valve, assuming it is not plugged, in normal operations, who is to say at what point there might be a possible wash-out? And so therefore, a handle may or may not in itself solve a particular problem.
 
 
 21
 Bennett, when asked if the valve could have been shut in time with a handle, replied
 
 
 22
 I would have to say that is an individual preference. I can't say that I would. I think from what I witnessed in this particular instance the first thing I thought about was self-preservation . . . I wouldn't have taken time to shut it, personally.
 
 
 23
 Bennett testified that it would be standard procedure to try to close the valve "if you thought you could get it closed safely." Benson testified
 
 
 24
 My first reaction was to try to close the valve and I reached for it and then there was so much smoke I realized I couldn't do it. . . .
 
 
 25
 Benson admitted that common sense directs the use of handles as the safest method to open valves but explained
 
 
 26
 In the case of this valve, there is no place to be that would be how do I say this. The valve is so located that you can't get in a position that you can stay in in order to close the valve and stay at the valve handle at all times.
 
 
 27
 Another maintenance employee testified that the standard procedure on seeing smoke would be to shut the valve off and speculated, "you wouldn't think to have enough oil to go out at one time to flash without you could shut it off immediately." In this particular accident there may have been no direct causal connection between the lack of handle and the flash fire. Evidence suggests, for example, the valve may have been opened so far that even a handle would not have closed it in time and that the employees may have been in unusually awkward positions. Because OSHA is designed to encourage abatement of hazardous conditions themselves, however, rather than to fix blame after the fact for a particular injury, a citation is supported by evidence which shows the preventability of the Generic hazard, if not this particular instance. See National Realty, 489 F.2d at 1266; Brennan v. OSHRC, 494 F.2d 460, 463 (8th Cir. 1974). We conclude, however, that the record fails to show substantial evidence that an employee, under any operating conditions, would be able to close this valve in response to the appearance of smoke signaling auto-ignitable oil if the valve were equipped with a handle. For example, there is no evidence of the time involved between appearance of smoke and ignition of the oil which followed. Similarly, the Secretary adduced no evidence that other Champlin employees had encountered smoke in bleeding valves and had been able to close valve handles in time to block the escape of hot oil.
 
 
 28
 Because the Secretary has failed to shoulder its burden of proof of the violation, the Commission's decision must be
 
 
 29
 REVERSED.