595 F.2d 264
 U. S. PIPE AND FOUNDRY COMPANY, Petitioner,
v.
Charles WEBB and Corda Webb, and Director, Office of
Workers' Compensation Programs, United States
Department of Labor, Respondents.
 No. 77-2713.
 United States Court of Appeals,
Fifth Circuit.
 May 18, 1979.
 
 John H. Morrow, W. L. Green, Linda A. Bunsey, Birmingham, Ala., for petitioner.
 Walter W. Furner, Bessemer, Ala., Laurie M. Streeter, Assoc. Sol., U. S. Dept. of Labor, N.D.O.L., Carin Ann Clauss, Sol. of Labor, Dept. of Labor, Christopher Giuliana, Atty., John S. Lopatto, III, Atty., Dept. of Labor, Washington, D.C., for respondents.
 Petition for Review of an Order of the Benefits Review Board.
 Before RONEY, RUBIN and VANCE, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 On April 19, 1974, Charles Webb, employed for twenty-nine years as a coal miner by U.S. Pipe and Foundry Company, submitted a claim for black lung benefits under the Federal Coal Mine Health and Safety Act of 1969 (the FCMHSA), as amended. Webb died on March 12, 1975. His widow, Corda Webb, claimed widow's benefits under the FCMHSA on March 27, 1975. The claims were consolidated, and the hearing officer concluded that Charles Webb was totally disabled by pneumoconiosis when he died and that pneumoconiosis caused his death. U.S. Pipe was ordered to pay black lung benefits to Charles Webb's estate and to Corda Webb. The Benefits Review Board affirmed the hearing officer's decision and order. U.S. Pipe appeals the Benefits Review Board's affirmance, claiming that the hearing officer's decision is not supported by substantial evidence, that the admission of ex parte doctors' reports deprived it of its right to cross-examination, and that a delay in notifying it of the Webbs' claims denied it due process of law. We affirm.
 
 
 2
 The legislative morass with which we must again struggle in deciding this case was originally enacted as the Federal Coal Mines Health and Safety Act of 1969, Pub.L.No. 91-173, Title IV, 83 Stat. 792 (1969), was amended by the Black Lung Benefits Act of 1972, Pub.L.No. 92-303, 86 Stat. 153, 154 (1972), and is now codified at 30 U.S.C. § 901 Et seq. See Director v. Alabama By-Products Corp., 560 F.2d 710 (5th Cir. 1977). Recently the FCMHSA was again amended by the Black Lung Benefits Reform Act of 1977, Pub.L.No. 95-239, 92 Stat. 95 (1978).[1] FCMHSA is also cross-referenced to sections of the Longshoremen's and Harbor Workers' Compensation Act (the LHWCA), 33 U.S.C. § 901 Et seq. and the Social Security Act, 42 U.S.C. § 401 Et seq. See 30 U.S.C. §§ 922, 932.
 
 
 3
 Congress enacted the black lung benefit section of the FCMHSA for the following purposes:It is . . . to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease or who were totally disabled by this disease at the time of their deaths; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.
 
 
 4
 30 U.S.C. § 901. In the FCMHSA, pneumoconiosis is defined as "a chronic dust disease of the lung arising out of employment in an underground coal mine."[2] 30 U.S.C. § 902. Title IV of the FCMHSA, portions of which were found constitutional in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), is divided into three parts. Part A of Title IV, §§ 401, 402, 30 U.S.C. §§ 901, 902, contains the purpose of the Act and necessary definitions. Part B of Title IV, §§ 411-414, 30 U.S.C. §§ 921-924, provides that claims submitted between December 30, 1969, and June 30, 1973, are to be paid by the United States and processed by the Secretary of Health, Education and Welfare. According to Part C of Title IV, §§ 421-431, 30 U.S.C. §§ 931-941, claims submitted after December 31, 1973, are adjudicated under the applicable state workmen's compensation statute if one has been approved by the Secretary of Labor. To be approved, a state workmen's compensation program must satisfy the standards set out in § 421, 30 U.S.C. § 931. If no state workmen's compensation law has been approved, claims filed under Part C are paid by the mine operators and processed by the Secretary of Labor. 30 U.S.C. § 932. If no operator is required "to secure the payment of such benefits, the Secretary shall pay (the claimant) the benefits to which he or she is so entitled." 30 U.S.C. § 934. Claims filed between July 1 and December 31, 1973, a transition period, are adjudicated by the Secretary of Labor and paid by the United States. 30 U.S.C. § 925. The Webbs' claims were filed under Part C of the FCMHSA.
 
 I.
 
 5
 The hearing officer's findings must be upheld if they are supported by substantial evidence. Banks v. Chicago Grain Trimmers Association, Inc., 390 U.S. 459, 467, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968); United States Steel Corp. v. Bridges, 582 F.2d 7 (5th Cir. 1978); Felthager v. Weinberger, 529 F.2d 130 (10th Cir. 1976). U.S. Pipe contends that the hearing officer's decision and order are arbitrary, irrational, and not supported by substantial evidence. We disagree.
 
 
 6
 The hearing officer has the responsibility of determining the credibility of witnesses and resolving inconsistencies in the evidence. United States Steel Corp. v. Bridges, supra; Peabody Coal Co. v. Benefits Review Board, 560 F.2d 797 (7th Cir. 1977). He or she need not accept the opinions or theories of a particular medical expert, but may weigh the evidence and draw his or her own inferences from it. Peabody Coal Co. v. Benefits Review Board, 560 F.2d at 802; Todd Shipyards Corp. v. Donovan, 300 F.2d 741, 742 (5th Cir. 1962). A reviewing court may not overturn a hearing officer's inference supported by substantial evidence simply because it considers the opposite inference more reasonable or because it finds the inference factually questionable. Cardillo v. Liberty Mutual Insurance Co., 330 U.S. 469, 477-78, 67 S.Ct. 801, 91 L.Ed. 1028 (1947); Peabody Coal Co. v. Benefits Review Board, 560 F.2d at 802.
 
 
 7
 Charles Webb worked at Flat Top Coal Mine, owned by U.S. Pipe, from August 28, 1945, until March 26, 1974. He was a machinist in an above-ground machine shop and made infrequent trips underground to perform maintenance duties. Before 1969 the machine shop was approximately forty to fifty feet from the mine exit, but since that time, it has been six hundred to one thousand feet from the exit. On the basis of air samples taken after 1971 in the breathing zones of workers closer to the mine exit than the old machine shop and of machinists in the new machine shop, U.S. Pipe's corporate safety director testified that concentrations of respirable dust in Charles Webb's work area were well below safety limits set by the United States Bureau of Mines and the Occupational Safety and Health Administration. Webb's two daughters, however, testified that, when they had visited their father's work site, they had observed coal dust flying from coal cars as the cars left the mine and collecting in the area around the machine shop. They also stated that their father sometimes returned from work covered with dust:
 
 
 8
 Q. Now, on occasions when your father would come home from his shift, did you observe his clothing?
 
 
 9
 A. Yes.
 
 
 10
 Q. Did you ever observe any black soot on it?
 
 
 11
 A. Completely. You could only see the whites of his eyes. He walked home, you know, to the house. You could distinguish his walk from the other men he walked with because this hand (indicating) moved a little bit faster than this hand (indicating) did. Other than that, you couldn't tell him from the rest of the men.
 
 
 12
 Q. Is it your testimony then, that even his face, except for his white eyes was covered in a black soot?
 
 
 13
 A. Right, as well as his clothes.
 
 
 14
 Webb managed a small ornamental iron business in his spare time and smoked cigarettes.
 
 
 15
 In 1972 Webb underwent surgery to remove cancer of the tongue. The cancer was not arrested, and in 1974 neck resection and cobalt therapy were required. Webb did not return to his job at Flat Top Mine after the 1974 operation. Since 1971, Webb had also been afflicted with pleurisy, pneumonia, and lung lesions. His daughters testified that during his last years he was short of breath, that he coughed so frequently that his wife was forced to sleep in a separate room, that he slept with his head elevated approximately twelve inches from his bed, that he tired easily, and that he could no longer perform physical activities like hunting or cutting grass. He died in March 1975 at the age of fifty-seven. In Webb's death certificate, Dr. Maddox, who had treated Webb for cancer, listed pulmonary insufficiency due to emphysema as the immediate cause of his death and prior carcinoma of the tongue as a contributing condition.
 
 
 16
 After his claim was filed, x-rays of Webb's chest were made on April 26, 1974,[3] on November 25, 1974, and again on March 4, 1975. Large and small opacities in Webb's lungs were revealed in at least the March 1975 x-ray. Several physicians examined Webb or read his x-rays, but they did not agree on the cause of his lung condition. In a report written after reading the November 1974 x-ray, Dr. Terrell Bird indicated that Webb's lung fields were clear of active infiltrates and that pneumoconiosis was not present. Dr. Juan Gonzales, a radiologist, read the March 1975 x-ray as showing category 2 simple pneumoconiosis, large opacities "compatible with complicated pneumoconiosis category B," and a pleural effusion that suggested a malignancy in Webb's right lung. Dr. Jack C. Whites, a general practitioner who does not read his own x-rays, examined Webb on March 4, 1975, the date of his last x-ray, and made a diagnosis of metastic carcinoma of the tongue and pulmonary metastasis with pleural effusion. Based on Webb's prior medical history, he concluded that Dr. Gonzales' findings of simple and complicated pneumoconiosis might actually represent metastatic seeding and thus that Webb's disabilities were probably not related to pneumoconiosis. Dr. William Cole, a radiologist, read the March 1975 x-ray as demonstrating simple pneumoconiosis, category 3, complicated pneumoconiosis, category B, and extensive pleural involvement suggesting mesathelemia. In a deposition given after reading all three x-rays, however, Dr. Edgar Givhan, a specialist in internal medicine, testified that the March 1975 x-ray showed simple pneumoconiosis that had not progressed since the previous April and other disorders not caused by dust exposure. On the day before Webb's death, he was examined by Dr. Seaburt Goodman. Dr. Goodman diagnosed chronic occupational pneumoconiosis with pulmonary emphysema, chronic bronchitis, and generalized arteriosclerosis as Webb's lung ailments and opined that these conditions were related to Webb's exposure to dust in his coal mine employment. Dr. Whites also stated that the simple pneumoconiosis shown in the November 1974 x-ray could not have become complicated pneumoconiosis by March 1975, and Dr. Givhan expressed the opinion that simply pneumoconiosis did not progress unless the lungs were exposed to additional coal dust.
 
 
 17
 On the basis of the March 1975 x-ray, the hearing officer determined that the claimants were entitled to black lung benefits. He concluded that Webb "was totally disabled at the time of his death, and that he died due to pneumoconiosis," in accordance with the following irrebuttable presumption provided in § 411(c)(3) of the FCMHSA:
 
 
 18
 (3) if a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, . . . then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be. . . .
 
 
 19
 30 U.S.C. § 921(c)(3).[4] The hearing officer thus rejected the opinions of Dr. Bird, Dr. Whites, and Dr. Givhan, and accepted the opinions of Dr. Gonzales and Dr. Cole, the radiologists who noted large opacities in the March 1975 x-ray and classified them in category B. Although U.S. Pipe attempted to show that the atmosphere in Webb's work area had been relatively clean since 1970, the hearing officer credited the testimony of Webb's daughters and reasoned that "the most generous inferences that may reasonably be drawn from (U.S. Pipe's) evidence may not be carried all the way back to 1945." The hearing officer recognized that Webb's cancer contributed to his death, but found that preexisting and independent respiratory problems disabled him and eventually caused his death. These and other inferences drawn by the hearing officer are rational and are supported by substantial evidence. Weighing and resolving inconsistencies in the evidence are duties properly within the competence of the hearing officer; "Congress does not permit us to substitute our judgment for that of the trier of fact, who heard the testimony and observed the witnesses' demeanor." Peabody Coal Co. v. Benefits Review Board, 560 F.2d at 802-803. We therefore will not disturb the decision that the claimants were entitled to benefits under the presumption provided in the FCMHSA.
 
 II.
 
 20
 A report by Dr. Goodman and rereadings of Webb's x-rays by Dr. Cole and Dr. Bristol were admitted into evidence at the administrative hearing. These three doctors, however, neither testified nor attended the hearing. U.S. Pipe argues that the admission of these reports was erroneous because it deprived it of its right to confront adverse witnesses. It also contends that it was prejudiced by the admission of these documents because, had they not been allowed into evidence, a decision in favor of Webb would not have been supported by substantial evidence. We find, however, that U.S. Pipe was not denied its right to cross-examine adverse witnesses by the admission of these Ex parte reports.[5]
 
 
 21
 Title IV, § 422(a), as amended, 30 U.S.C. § 932(a), provides that, if no applicable state workmen's compensation program has been approved, claims filed under Part C of the FCMHSA are to be processed by the Department of Labor in accordance with provisions of the LHWCA, as amended, 33 U.S.C. § 901 Et seq. Usery v. Turner Elkhorn Mining Co., supra. This referencing section has not, however, been given a completely literal interpretation because "(a)ny attempt to discern Congressional intent by resort to the textual language of the pertinent incorporating section with its direct list of excluded LHWCA provisions and implicit reference to included LHWCA provisions leads almost immediately to an incredible muddle of technical mistakes." Director v. Peabody Coal Co., 554 F.2d 310, 320 (7th Cir. 1977). Accord, Director v. Alabama By-Products Corp., supra; Krolick Contracting Corp. v. Benefits Review Board, 558 F.2d 685 (3d Cir. 1977). Courts have instead concluded that the reference to the LHWCA is general rather than specific and that the referencing section must be construed in a way that effectuates the purposes of the FCMHSA as amended by the Black Lung Benefits Act. Director v. Alabama By-Products Corp., supra; Director v. Peabody Coal Co., 554 F.2d 310 (7th Cir. 1977).
 
 
 22
 Congress seems to have intended that the reports of examining doctors and radiologists' reports be admissible in administrative hearings on claims brought under the FCMHSA. Section 413(b), as amended, provides in part,
 
 
 23
 In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examinations, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.
 
 
 24
 30 U.S.C. § 923(b). One of the Social Security Act's provisions incorporated by reference into § 413(b) of the FCMHSA permits evidence to be received "at any hearing before the Secretary even though inadmissible under rules of evidence applicable to court procedure." 42 U.S.C. § 405(b). Section 413 is in Part B of the Black Lung Benefits Act, but this claim is brought under Part C. On its face, § 413 applies only to claims brought under Part B. Sections of Part B are, however, incorporated into Part C. See, e. g., 30 U.S.C. § 932(c). The legislative history of the Black Lung Benefits Act of 1972 indicates that the Senate intended the applicable portions of Part B, as amended, to apply to Part C. S.Rep. No. 92-743, 92d Cong., 2d Sess. 21, Reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 2305, 2325. Under Part C, a state workmen's compensation program is permitted to supplant the federal black lung benefits program only if its coverage is adequate for pneumoconiosis, its cash benefits are approximately equivalent to or greater than those provided by the federal program, and its standards for determining death or disability caused by pneumoconiosis are substantially equivalent to those used by the federal program. 30 U.S.C. § 931. The evidentiary standards to be used in adjudicating a Part C claim when no applicable state program has been approved are certainly not intended to be more strict than those to be used in processing Part B claims. U.S. Pipe does not dispute that the hearing provisions of the Social Security Act, referenced only in § 413 of the FCMHSA, apply to this Part C claim.
 
 
 25
 In Richardson v. Perales, 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Supreme Court of the United States decided that hearsay may constitute substantial evidence in administrative proceedings as long as factors that assure the "underlying reliability and probative value" of the evidence are present. The written report of a licensed physician was thus found to be admissible into evidence in a Social Security disability claim hearing.[6] The following factors, noted by this court, demonstrated the hearsay's probative value and reliability in Richardson: the out-of-court declarants were not biased and had no interest in the result of the case; the opposing party could have obtained the reports before the hearing and could have subpoenaed the declarants; the reports were not inconsistent on their face; and courts have traditionally recognized that medical reports written by treating physicians are inherently reliable. School Board of Broward County, Florida v. HEW, 525 F.2d 900, 906 (5th Cir. 1976).
 
 
 26
 Several factors assured the reliability and probative value of the three doctors' reports challenged by U.S. Pipe. Doctors Goodman, Cole, and Bristol were neither biased nor interested in the outcome of the case; claimants obtained the reports from the records of the Department of Labor. Under the regulations, U.S. Pipe was entitled to a copy of medical reports and evidence before the hearing. See 20 C.F.R. §§ 725.151, 725.153, 725.435, 725.440 (1978). Prospective witnesses may also be subpoenaed and deposed. 20 C.F.R. §§ 725.403, 725.463 (1978). The reports were not substantially inconsistent on their face and were standard routine evaluations by trained physicians working within their areas of competence. The doctors based their diagnoses on accepted medical tests and procedure and on personal observations of either Webb himself or his x-rays. See Richardson v. Perales, 402 U.S. at 403, 404, 91 S.Ct. 1420.
 
 
 27
 Dr. Goodman examined Webb on the day before Webb's death. Because it is the written evaluation of an examining physician, Dr. Goodman's report is squarely within the Richardson rule. Dr. Bristol and Dr. Cole, however, did not see Webb, but only x-rays made of his chest. Dr. Bristol interpreted the April 1974 x-ray as showing simple pneumoconiosis; therefore, his report was favorable to U.S. Pipe, not to claimants.[7] Dr. Cole, a radiologist and certified B reader, however, reported that Webb's March 1974 x-ray showed complicated as well as simple pneumoconiosis. X-ray rereadings by radiologists certified by the National Institute for Occupational Safety and Health are commonly accepted as relevant, probative evidence in black lung benefits actions when Richardson safeguards are present. See, e. g., Stump v. Mathews, 442 F.Supp. 457 (D.Del.1977); Bashinsky v. Mathews, 437 F.Supp. 50 (E.D.Pa.1977); Ward v. Mathews, 403 F.Supp. 95 (E.D.Tenn.1975).
 
 
 28
 Although he did not mention Dr. Bristol's report in his opinion and order, the hearing officer discussed Dr. Goodman's evaluation and relied heavily on Dr. Cole's x-ray rereading. Without considering these two reports, we might still find that the hearing officer's decision in favor of claimants was supported by substantial evidence. We conclude, however, that the challenged reports were sufficiently probative and trustworthy to be admissible and to constitute substantial evidence.
 
 III.
 
 29
 Webb filed his claim for black lung benefits on April 19, 1974, and listed U.S. Pipe as his most recent employer. His widow filed her claim for survivor's benefits on March 27, 1975. The Office of Workers' Compensation Programs did not notify U.S. Pipe of the claims until August 19, 1975, five months after Webb's death. U.S. Pipe argues that this delay in giving notice of the claims denied it due process of law because the delay prevented U.S. Pipe from obtaining further medical examinations during Webb's life and an autopsy after his death. We do not agree.
 
 
 30
 Because the Webbs' claims were filed under Part C, the processing of the claims is governed by the following provisions in § 422 of the FCMHSA:
 
 
 31
 (a) During any period after December 31, 1973, in which a State workmen's compensation law is not included on the list published by the Secretary under section 931(b) of this title, the Provisions of Public Law 803, 69th Congress (44 Stat. 1424, approved March 4, 1927) (the Longshoremen's and Harbor Workers' Compensation Act, codified at 33 U.S.C. § 901 Et seq.), as amended (other than the provisions contained in sections 1, 2, 3, 4, 8, 9, 10, 12, 13, 29, 30, 31, 32, 33, 37, 38, 41, 43, 44, 45, 46, 47, 48, 49, 50, and 51 thereof) shall (except as otherwise provided in this subsection and except as the Secretary shall by regulation otherwise provide), be applicable to each operator of coal mine in such State with respect to death or total disability due to pneumoconiosis arising out of employment in such mine.
 
 
 32
 30 U.S.C. § 932(a). No approved state workmen's compensation law was applicable to the Webbs' claims; thus the procedure to be used in processing their claims was provided in the LHWCA, 33 U.S.C. § 901 Et seq. U.S. Pipe asserts that it was denied due process because the Office of Workmen's Compensation Programs did not comply with the following notice requirement contained in § 19 of the LHWCA:
 
 
 33
 (b) Within ten days after such claim is filed the deputy commissioner, in accordance with regulations prescribed by the Secretary, shall notify the employer and any other person (other than the claimant), whom the deputy commissioner considers an interested party, that a claim has been filed.
 
 
 34
 33 U.S.C. § 919(b). The Director of the Office of Workmen's Compensation Programs replies that the notice given U.S. Pipe was proper because it complied with regulations promulgated by the Secretary of Labor under Part C of the FCMHSA. See 20 C.F.R. §§ 725.140, 725.151 (1978).
 
 
 35
 The regulations that govern claims filed under Part C of the FCMHSA create a processing scheme somewhat different from the one described in the LHWCA. See 20 C.F.R. § 725.1 Et seq. (1978). Under the regulations, claims must be presented for filing to an office of the Social Security Administration. 20 C.F.R. § 725.121 (1978). The Social Security office then informs the Office of Workmen's Compensation Programs (OWCP) that the claim was filed, and the OWCP establishes a case file and assigns the case a claim number. 20 C.F.R. § 725.130 (1978). The claimant, assisted by the Social Security office, obtains medical and other evidence and submits it to the OWCP. Id. After the OWCP receives the claim and supporting evidence, it tentatively decides whether the claim is valid and establishes the identity of any coal mine operators who, as responsible operators, may be required to pay black lung benefits to the claimant. 20 C.F.R. §§ 725.138, 725.140, 725.151 (1978). The claim is then filed with the deputy commissioner who, "to the extent appropriate, follow(s) the procedures provided in section 19 of the Longshoremen's and Harbor Workers' Compensation Act." 20 C.F.R. § 725.140(a) (1978). If, after reviewing the case file, and, in some instances, accumulating more evidence, the deputy commissioner decides that the claim is within the Secretary of Labor's jurisdiction, he or she determines the identity of the responsible operator or operators and notifies each responsible operator and his or her insurance carrier. 20 C.F.R. §§ 725.140, 725.151 (1978).
 
 
 36
 U.S. Pipe first argues that the lengthy delay in notifying it of the Webbs' claims was not authorized by the FCMHSA and the regulations. Neither the regulations nor the FCMHSA excuse the deputy from complying with the ten day notification requirement. U.S. Pipe contends that the regulations can be construed as requiring notice to be given within ten days of the date on which the employee submits his claim and during the period used by the Social Security office and the OWCP to conduct their preliminary investigations. Following this procedure would have been simple and practical in the Webb case, U.S. Pipe asserts, because Webb identified U.S. Pipe as his most recent employer when he claimed black lung benefits. U.S. Pipe thus demands that the regulations be interpreted to require the government to follow the ten day notice requirement in § 19 of the LHWCA when it is appropriate.
 
 
 37
 In urging this interpretation, however, U.S. Pipe ignores both the plain language of the regulations and the administrative scheme of which they are a part. See Diamond Roofing Company, Inc. v. Occupational Safety & Health Review Commission, 528 F.2d 645, 649 (5th Cir. 1976). A responsible operator is not notified of the claim until after it is filed with the deputy commissioner, and it is not filed with the deputy commissioner until after the OWCP has collected evidence and tentatively determined the validity of the claim and the identity of the responsible operator. 20 C.F.R. §§ 725.138, 725.140 (1978). The Director argues that the forwarding of a claim from the Social Security Administration field office to the Department of Labor consumes almost ten days.[8] We find that the regulations in issue cannot be construed to require the government to notify the employer of the claim within ten days after the claimant submits his or her application to the Social Security office.
 
 
 38
 If the regulations are construed to permit delayed notice, U.S. Pipe asserts that they are invalid because they are not authorized by § 422 of the FCMHSA, 30 U.S.C. § 932. A regulation must be consistent with the statute or statutes under which it is promulgated. United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Marshall v. Gibson's Products, Inc., 584 F.2d 668 (5th Cir. 1978). Regulations are presumed valid unless they are shown to be unreasonable or contrary to the provisions of the enabling statute. U. S. ex rel. Mississippi Road Supply Co. v. H. R. Morgan, Inc.,542 F.2d 262 (5th Cir. 1976), Cert. denied, 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977). See Director v. Alabama By-Products Corp., supra; Director v. Peabody Coal Co., 554 F.2d 310, 341 (7th Cir. 1977). When a statute provides that an agency may enact rules and regulations necessary to effectuate the provisions of the statute, "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' " Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quotingThorpe v. Housing Authority of City of Durham, 393 U.S. 268, 280-281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)). Accord, Fredericks v. Kreps, 578 F.2d 555 (5th Cir. 1978).
 
 
 39
 Section 422 of the FCMHSA incorporates § 19 and other sections of the LHWCA "except as otherwise provided in this subsection and except as the Secretary shall by regulation otherwise provide . . . ." 30 U.S.C. § 932(a). In administering Part C, the Secretary is also authorized
 
 
 40
 to prescribe in the Federal Register such additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part and thereafter those provisions shall be applicable to such operator.
 
 30 U.S.C. § 932(a).[9]
 
 41
 This court has construed § 422 of the FCMHSA and its corresponding regulations in conjunction with the referenced LHWCA provisions in only one previous case, Director v. Alabama By-Products Corp., supra. Although § 422 empowers the Secretary to promulgate regulations, a regulation promulgated under § 422 and the incorporated statute, § 19 of the LHWCA, but inconsistent with their terms, must be struck down unless the deviation is authorized by Congress. Director v. Alabama By-Products Corp., supra. We have upheld, as have other courts of appeals considering this issue, the validity of 20 C.F.R. § 715.101(a)(27), even though that regulation enables a hearing officer, rather than the administrative law judge required in § 19(d) of the LHWCA, to adjudicate black lung benefit claims. Director v. Alabama By-Products Corp., supra. See, e. g., Director v. Eastern Coal Corp., 561 F.2d 632 (6th Cir. 1977), Krolick Contracting Corp. v. Benefits Review Board, supra.[10] The decision in Alabama By-Products Corp. was based on several appropriations acts in which Congress expressly authorized the Secretary to appoint qualified persons other than administrative law judges to conduct hearings on black lung claims. Although it grounded its decision on specific Congressional authorization, this court noted, "The history of the black lung program tells us that expedition in administration must be our guiding principle in parsing the exquisite syntax in which many voices of Congress speak." Director v. Alabama By-Products Corp., 560 F.2d at 720.
 
 
 42
 Several factors indicate that the contested regulations reasonably promote the purposes of the FCMHSA and expedite the processing of black lung claims. Many claimants are elderly and have not worked in coal mines for many years. A coal mine in which a claimant was employed may change operators over a period of years. See 30 U.S.C. § 932(i); 20 C.F.R. § 725.311 (1978). Identifying a responsible operator or a potentially responsible operator is often difficult and time consuming. Immediately after a claim is submitted to a Social Security office, evidence is collected and the claim's validity is tentatively determined. Between July 1, 1973, and December 31, 1977, 122,812 claims were submitted, 73,806 claims were processed, but only 5,744 claims were approved at the administrative level. (1978) U. S. Dep't. of Labor, Annual Report on Administration of the Black Lung Benefits Act 21. A responsible operator determination is made and the claim is filed with the deputy commissioner pursuant to 20 C.F.R. § 725.140 only if the claim is approved or if a claimant whose claim is denied requests a hearing. A responsible operator or potentially responsible operator is not notified unless the preliminary evaluation of the evidence convinces the OWCP that the claim has merit and the claim is approved or unless the claim is denied and a hearing is demanded. In the case Sub judice, the operator was given notice of the claim on the day it was filed with the deputy commissioner. Because most claims submitted are not approved, a responsible operator need not be identified or notified in most cases. This scheme minimizes the administrative time and effort used in processing black lung claims; in fact, the Director asserts that, without 20 C.F.R. § 725.140 and 20 C.F.R. § 725.151, implementing the black lung benefits program would be impossible. Although the processing scheme chosen by the Secretary may not be the best one that could have been developed, it is a reasonable method of administering the FCMHSA and assuring the payment of black lung benefits.
 
 
 43
 Section 19(b) of the LHWCA, 33 U.S.C. § 919(b), specifically provides, "Within ten days after such claim is filed the deputy commissioner, in accordance with regulations prescribed by the Secretary, shall notify the employer and any other person . . . whom the deputy commissioner considers an interested party, that a claim has been filed." Not only § 422 of the FCMHSA, but also the referenced § 19(b) of the LHWCA thus contemplates the promulgation of regulations by the Secretary.[11] The language of § 19(b) indicates that the regulations may describe the procedures to be followed by the deputy commissioner in processing a claim. The phrase "whom the deputy commissioner considers an interested party" also implies that the government may determine whether prima facie evidence supports the claim and whether a responsible employer can be identified before the deputy commissioner must notify the interested parties. The contested regulations are thus consistent with § 19(b) of the LHWCA as well as § 422 of the FCMHSA.
 
 
 44
 U.S. Pipe has not overcome the presumptive validity of 20 C.F.R. § 725.140 and 20 C.F.R. § 151. It has shown neither that those regulations are inconsistent with the enabling statutes nor that they are unrelated to the purposes of the FCMHSA. In promulgating the regulations, the Secretary did not exceed the authority conferred by § 422 of the FCMHSA.
 
 
 45
 The challenged regulations and processing scheme also do not violate the fifth amendment to the Constitution of the United States by depriving U.S. Pipe of property without due process of law. At a minimum, a party who may be deprived of property by adjudication must first be given reasonable notice of the opposing claims and an opportunity to refute them. Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); North Alabama Express, Inc. v. United States, 585 F.2d 783 (5th Cir. 1978). To be adequate, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. at 314, 70 S.Ct. at 657. Accord, Armstrong v. Manzo, supra; Potter v. Castle Construction Co., 355 F.2d 212 (5th Cir. 1966). Because due process is a flexible concept, the governmental and private interests affected in each case must be examined to determine whether the procedure used was constitutionally adequate. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); Shell Oil Co. v. Federal Power Commission, 520 F.2d 1061 (5th Cir. 1975), Cert. denied, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). To establish a denial of procedural due process, a party must show substantial prejudice. Arthur Murray Studio of Washington, Inc. v. Federal Trade Commission, 458 F.2d 622 (5th Cir. 1972). Cf. Chromcraft Corp. v. United States E. E. O. C., 465 F.2d 745 (5th Cir. 1972) (provisions of 5 U.S.C. § 706 interpreted).
 
 
 46
 U.S. Pipe argues that the delayed notice was constitutionally defective because it prevented U.S. Pipe from obtaining medical evidence and, thus, prevented preparation of an effective defense. Had U.S. Pipe been notified of Webb's claim during his life, it argues, it could have conducted medical examinations. It also contends that the delayed notification prevented it from having a prompt and conclusive autopsy performed.
 
 
 47
 U.S. Pipe has not, however, shown that its defense was substantially prejudiced by the delay. Neither the FCMHSA nor the regulations promulgated thereunder entitle the employer to require an autopsy,[12] although 20 C.F.R. § 725.153 (1978) empowers an operator to have a claimant examined by a physician. Similarly, the LHWCA grants the employer no power to compel that an autopsy be performed. U.S. Pipe requested an exhumation and autopsy, but the Director alleges, and U.S. Pipe does not deny, that U.S. Pipe did not formally ask for performance of an autopsy after Webb's widow refused its request. The Director also asserts that U.S. Pipe did not utilize all discovery devices provided in the Act and regulations; for example, U.S. Pipe relied on the written reports of physicians who examined Webb rather than deposing the physicians. Numerous tests were performed on Webb and many examinations were conducted during Webb's life in the course of the government's preliminary investigation of his claim. U.S. Pipe had access to the results of these tests and examinations, many of which were favorable to its position.
 
 
 48
 Section 422(f)(1) of the FCMHSA, 30 U.S.C. § 932(f)(1), provides, "Any claim for benefits under this section shall be filed within three years of the discovery of total disability due to pneumoconiosis or, in the case of death due to pneumoconiosis, the date of such death." By enacting this limitations period, Congress permits a survivor to claim benefits as late as three years after the miner's death. In some cases, therefore, Congress requires the responsible operator to defend itself against claims not filed until medical tests and an effective autopsy have become impossible.
 
 
 49
 U.S. Pipe was notified of the claims against it on August 19, 1975, sixteen months after Webb filed his claim, five months after Webb's widow filed her claim, and five months before the joint hearing began. We have difficulty in understanding why U.S. Pipe could not have been notified sooner, but, under the circumstances, the notice given U.S. Pipe apprised it of the claims against it and afforded it a sufficient opportunity to prepare and to present a defense.
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 The Director urges us to decide this case on the basis of statutes and regulations in force before the enactment of the 1978 amendments. U.S. Pipe does not rely on the Black Lung Benefits Reform Act of 1977. In ruling on this case we will therefore consider only the standards and procedures in effect before the enactment of the 1978 amendments
 In United States Steel Corp. v. Gray, 588 F.2d 1022 (5th Cir. 1979), another panel of this court granted an employer's petition for review and remanded the case to the Benefits Review Board for reconsideration of its decision awarding benefits under the FCMHSA. It decided that, on remand, the Board should apply the statutory standards in effect in 1975 when the claim was heard rather than those created in the Black Lung Benefits Reform Act of 1977. The court acknowledged the general rule that appellate courts "must apply law that becomes effective after judgment is entered but before the appeal is decided"; however, it found that, to avoid manifest injustice, the new standards should not be used unless the parties were allowed to reopen the 1975 record and present evidence in response to the 1978 amendments. Id. at 1030.
 
 
 [2]
 In the Black Lung Benefits Reform Act of 1977, pneumoconiosis is redefined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." Black Lung Benefits Reform Act of 1977 § 2(a) (to be codified at 30 U.S.C. § 902(b))
 
 
 [3]
 A pulmonary function test was also given Webb April 26, 1974; the hearing officer, however, found that it failed "to establish disability pursuant to 20 C.F.R. § 410.426(b), although the results show(ed) a reduction from predicted values for vital capacity and maximum breathing capacity."
 
 
 [4]
 The hearing officer nevertheless added that his conclusion was adequately supported by the evidence without the irrebuttable presumption
 
 
 [5]
 Bethlehem Steel Corp. v. Clayton, 578 F.2d 113 (5th Cir. 1978) and Southern Stevedoring v. Voris, 190 F.2d 275 (5th Cir. 1951) do not control this issue. In those cases this court held that Ex parte doctors' reports were hearsay and should not have been admitted in a hearing on a claim brought under the Longshoremen's and Harbor Workers' Compensation Act. The court found that their admission denied the opposing party the right of cross examination. These holdings, however, were based on the facts in the cases. In another case brought under the LHWCA, this court noted that "hearsay evidence is generally admissible if considered reliable." Young & Company v. Shea, 397 F.2d 185, 188 (5th Cir. 1968), Cert. denied, 395 U.S. 920, 89 S.Ct. 1771, 23 L.Ed.2d 237 (1969)
 
 
 [6]
 The court concluded that
 a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence may be received as evidence in a disability hearing and, despite its hearsay character and an absence of cross-examination, and despite the presence of opposing direct medical testimony and testimony by the claimant himself, may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the reporting physician and thereby provide himself with the opportunity for cross-examination of the physician.
 402 U.S. at 402, 91 S.Ct. at 1428.
 
 
 [7]
 Dr. Goodman also read the April 1974 x-ray as indicating simple rather than complicated pneumoconiosis
 
 
 [8]
 In his argument, the Director assumes that the regulations cannot be interpreted as requiring notice to be given the employer within ten days after the claimant submits his or her claim application. Great deference should be accorded the construction given to a statute or regulation by the agency assigned its administration. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Adkins v. Hampton, 586 F.2d 1070, 1073 (5th Cir. 1978); Floyd S. Pike Electrical Contractor, Inc. v. Occupational Safety & Health Review Commission, 576 F.2d 72 (5th Cir. 1978). The administrative interpretation, therefore, "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Accord U. S. v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Udall v. Tallman, supra; Gillring Oil Co. v. Federal Energy Regulatory Commission, 566 F.2d 1323 (5th Cir. 1978)
 
 
 [9]
 This provision illustrates the clumsy drafting of the FCMHSA. In Director v. Peabody Coal Co., 554 F.2d 310, 321 n. 15 (7th Cir. 1977), the court speculated that Congress intended to permit the promulgation of "additional provisions 'not inconsistent with those Not specifically excluded' " by the subsection. (emphasis in original)
 
 
 [10]
 The Court of Appeals for the Fourth Circuit, on the other hand, discerned in the language of § 422 and its legislative history the congressional intention to enable the Secretary to deviate from specific provisions of the LHWCA if a deviation facilitated the proper administration of the black lung benefits program. Director v. National Mines Corp., 554 F.2d 1267, 1274 (4th Cir. 1977). The Court of Appeals for the Seventh Circuit concluded, after studying § 422 and the incorporated provisions of the LHWCA, that "Congress directed no real attention to checking or cross-checking the links between the two statutes." Director v. Peabody Coal Co., 554 F.2d 310, 329 (7th Cir. 1977)
 
 
 [11]
 A provision of this type is not included in § 19(d) of the LHWCA, the referenced section in issue in Director v. Alabama By-Products Corp., 560 F.2d 710 (5th Cir. 1977)
 
 
 [12]
 Although inapplicable here, Alabama's workmen's compensation statute, which provides compensation for pneumoconiosis of coal miners, states, "In all death claims where the cause of death is obscure or is disputed, any interested party may require an autopsy . . . ." Ala.Code § 25-5-77(b)