# IN THE COURT OF APPEALS OF IOWA

No. 13-1506
Filed October 15, 2014

**UNITED PARCEL SERVICE, INC.,**
        Petitioner-Appellant,

**vs.**

**EMPLOYMENT APPEAL BOARD**
**and COMMISSIONER OF LABOR,**
        Respondents-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Richard G. Blane II,

Judge.


        An employer appeals a judicial review order affirming a citation and

administrative penalties arising out of the Iowa Occupational Safety and Health

Act. **AFFIRMED.**


        Joan M. Fletcher of Dickinson, Mackaman, Tyler & Hagen, P.C., Des

Moines, and Carla J. Gunnin and Jodi D. Taylor of Baker, Donelson, Bearman,

Caldwell & Berkowitz, P.C., Atlanta, Georgia, for appellant.

        Thomas J. Miller, Attorney General, September M. Lau and Renner

Walker, Assistant Attorneys General, Administrative Law Division, for appellees.


        Heard by Potterfield, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

A semi-trailer truck entering the United Parcel Service (UPS) airport facility in the predawn hours of September 15, 2010, ran over UPS employee Daniel Raber, who was holding open the gate. Raber died from his injuries. In the wake of Raber's death, the Iowa Labor Commissioner investigated the safety conditions at the UPS facility. The commissioner issued a citation to UPS under the "general duty clause" of the Iowa Occupational Safety and Health Act (OSHA) alleging serious violations based on poor lighting and inadequate employee training on gate procedures. *See* Iowa Code § 88.4 (2009).

UPS contested the violations in administrative proceedings and before the district court. In judicial review of agency action, the district court upheld the decision of the Employment Appeal Board (EAB) confirming UPS's responsibility for the violations, as well as two $5000 civil penalties. UPS now asks us to reverse the district court's ruling. Because substantial evidence supports the EAB's decision, its application of the law to the facts was not illogical or irrational, and its decision was not arbitrary or capricious, we reach the same decision as the district court and affirm the OSHA citation and penalties.

*I.      Background Facts and Proceedings*

On September 14, 2010—one day before a novice truck driver[1] ran over Raber—the same driver, accompanied by a trainer, had trouble as he turned into the facility off Army Post Road in Des Moines. The driver jumped a curb on the right side of Gate 10, and inside the facility he had difficulty backing up the trailer.

---

[1] The driver was not employed by UPS, instead working for CRST, a company that contracted with UPS.

Allan Rutten, a long-time UPS employee who regularly drives a tractor trailer through Gate 10 to collect freight, discussed the CRST driver's actions with his co-workers, saying the inexperienced driver did not appear to know how to handle a tractor trailer.

The configuration of Gate 10 and the surrounding work area is important when considering the EAB's findings. When open, Gate 10 provides a roughly thirty-foot wide entry for the UPS container supply point, which is a secured loading facility for the Des Moines airport commonly called "the ramp." UPS required its employees to wear reflective vests while working on the ramp. Gate 10 is made of chain-link fencing and splits in the middle; it must be manually unlocked and both halves open inward toward the ramp area.

In September 2010, no UPS employee was permanently assigned to open Gate 10. Instead, numerous employees, including Raber, took turns opening the gate as the need arose. While the right half of the gate could be braced open using a pole, opening the left half required the UPS employee to manually hold the gate or tether it using a spring-loaded bungee cord. Before the fatal accident, none of the UPS employees had received training specific to opening Gate 10 for tractor trailers.

Immediately inside the UPS facility on the left side of Gate 10 is a building called the "guard shack." When open, the left half of Gate 10 is flush with the side of the guard shack. The guard shack was equipped with a floodlight on top, but the light was not working on September 15, 2010. As a result, the nearest source of light was a street lamp located nearly forty feet away. Because that

street lamp also was not functioning on the morning of the fatal accident, the area around Gate 10 was "pitch black" according to Joe Campbell, another UPS employee working in the vicinity. He recalled the lights inside the guard shack were turned on, but they were not bright.

Around 5:50 a.m., before sunrise, on September 15, 2010, Raber opened Gate 10 for two tractor trailers waiting to enter the UPS facility. UPS employee Rutten was driving the second truck in line and witnessed the events. Rutten recalled the scene was dark, but he could see Raber's silhouette and reflective vest by virtue of the lights inside the guard shack.

After opening and securing the right side of the gate, Raber stood near the guard shack and held the left side open. The CRST truck driver steered toward the left,[2] pinned Raber against the guard shack, and ran over him after he fell to the ground. The crushing injury resulted in Raber's death.

That same day, Ryan Headrick and lead investigator Joanna Wilson, employees of the Iowa OSHA division, investigated the accident and interviewed UPS employees. Wilson, an industrial hygienist, found it significant UPS required employees to wear reflective vests. During her interviews, "Everyone said it was dark. Management stated they should have had lighting in that area." Wilson also believed a lack of training contributed to the accident.

Two months later, the Iowa OSHA division issued a citation and notification of penalty to UPS. The citation alleged two items, both serious

---

[2] Rutten explained it was unusual for a semi driver to turn left at the gate because there is room to drive straight through before starting to turn. In his experience, drivers turn to the right at Gate 10 to make a delivery.

violations of the "general duty clause" in Iowa Code section 88.4,[3] and proposed a $5000 fine for each violation.

Citation 1 Item 1 alleged UPS violated section 88.4 "in that employees were exposed to a crushing hazard" based on poor lighting:

> Gate #10 – Employees were required to manually open Gate #10 for semi tractor trailers. The lighting on top of the guard shack was not on at the time of the accident. In addition, the street light in the area of [the] gate was not functioning at the time of the accident. Darkness was found to be a contributing factor to an accident at Gate #10 that resulted in a fatality. This condition was noted on or about 9/15/10.
> Among other methods, one feasible and acceptable abatement method to correct this hazard is to provide lighting that follows the set guidelines for industrial outdoor spaces provided in Table B2 of the ANSI/IES RP-7, 1991.

Citation 1 Item 2 alleged UPS violated section 88.4 "in that employees were exposed to a crushing hazard" based on a lack of training:

> Gate #10 – Employees were required to manually open Gate #10 for semi tractor trailers. No training was provided to employees on proper gate opening procedures. Lack of training was found to be a contributing factor to an accident at Gate #10 that resulted in a fatality. This violation was noted on or about 9/15/10.
> Among other methods, one feasible and acceptable abatement method to correct this hazard is to provide employees with training on proper gate opening procedures. This training should include at least the following: operation of lighting, gate securing procedures, safe practices while working in traffic, and communication with drivers.

---

[3] Iowa's general duty clause states the employer "shall furnish" to the employee "a place of employment which is free from recognized hazards that are causing or are likely to cause death or serious physical harm" to the employee. Iowa Code § 88.4. The intent of the general duty clause is "to cover serious hazards which are not addressed by a specific standard." *See Noble Drilling Serv., Inc.*, 19 BNA OSHC 1869, at *5 (No. 00-0462, 2002); *see also Midwest Carbide Corp. v. OSHRC,* 353 N.W.2d 339, 402 (Iowa 1984) (stating Iowa courts follow the guidance and federal interpretations of federal OSHA case law).

After UPS contested the citation, the Iowa Labor Commissioner filed a complaint with the EAB, and in October 2011 an administrative law judge (ALJ) held a contested case hearing.

To prove UPS violated the general duty clause, the labor commissioner had to prove the following four elements: (1) a condition or activity in the workplace presented a hazard to employees; (2) either UPS or its industry recognized the hazard; (3) the hazard was likely to cause death or serious physical harm; and (4) a feasible means existed to eliminate or materially reduce the hazard. *See Nelson Tree Serv., Inc., v. OSHRC*, 60 F.3d 1207, 1209 (6th Cir. 1995); *see also Midwest Carbide Corp.*, 353 N.W.2d at 402.

At the hearing UPS claimed the commissioner "failed to prove the second and fourth elements of a general duty violation"—that "there was no hazard recognized by the employer or the industry and that no feasible means existed to eliminate the hazard." The ALJ determined neither poor lighting nor a lack of training created hazards recognized by the employer or the industry and, accordingly, reversed the citations and penalties. The labor commissioner appealed to the EAB.

The EAB reversed the ALJ's ruling and affirmed the citation and penalties. Discussing the first violation, the EAB noted the labor commissioner identified "a crushing hazard" based on inadequate lighting. The EAB cited to investigator Wilson's testimony "the risks caused by darkness were twofold: first, it would be difficult for a driver to see a gate attendant in the darkness; and second, it would

be difficult for the gate attendant on the ground to see how things were lining up for a trailer's entry through the gate."

The EAB found the division relied on two factors in its determination UPS had knowledge of the hazard: (1) "where employees and vehicles, including semi trailers, are on the ground together, there is a danger"; and (2) "the fact that employees wear reflective vests to help with visibility means the employer knows that lack of lighting is a hazard." The EAB noted the "vest's bright color and its reflective white strips are designed to enhance an employee's visibility."

The EAB also found, in determining abatement, the division considered national standards and investigator Wilson opined the illuminance level at the time of the accident would not have met national standards. Finally, the EAB found the "street light was the nearest light at the time. The City light was not sufficient to see by. The only other light was the guard shack light. This light was not intended to illuminate the outside, and was insufficient as the outside remained quite dark."

The EAB's findings of fact continued with its discussion of the second violation, a crushing hazard based on lack of training. The EAB found the OSHA division determined UPS "had knowledge of the hazard because it required employees to wear reflective vests in traffic areas." Also, "Wilson testified that this action means the employer was aware that an employee coming into contact with a moving vehicle was a hazard." After noting the division proposed the abatement measure of training gate operators regarding safe standing locations, the EAB cited Wilson's testimony "employees should have been trained not to

stand in the 'line of fire' where they could become trapped between moving vehicles and stationary objects." While recognizing UPS's existing training includes how to work safely around the types of vehicles present on the air ramp," the EAB found: "Employees were permitted to secure Gate 10 in the open position in a variety of ways, including resting the gate on the curb [right side], securing it with a bungee cord, or manually holding it open [left side]. Employees were not trained that one particular method was preferable to another."

Applying the law to the facts, the EAB concluded the division had established UPS violated the general duty clause by exposing employees to crushing hazards based on a lack of lighting and a lack of training when feasible means of abatement existed.

UPS sought judicial review of the EAB decision. *See Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011) ("The district court may grant relief if the agency action has prejudiced the substantial rights of the petitioner, and the agency action meets one of the enumerated criteria contained in section 17A.19(10)(a) through (n)."). UPS claimed "there is no recognized hazard" and "there is no feasible means of abatement" and requested relief under Iowa Code sections 17A.19(10)(c), (f), (h), (k), (m), and (n). The district court affirmed the final agency action, and UPS appeals.

## II. Standards of Review

Our review of agency action is governed by Iowa Code section 17A.19(10). We may "reverse, modify, or grant other appropriate relief" if we determine the employer's substantial rights have been prejudiced because the

agency's action "meets any one of several statutory criteria." *See Lange v. Iowa Dep't of Revenue*, 710 N.W.2d 242, 247 (Iowa 2006); *see also* Iowa Code § 88.9(1) (providing judicial review of OSHA citations is in accordance with the Iowa Administrative Procedure Act).

UPS seeks relief on the following grounds: (1) the EAB's findings of fact are "not supported by substantial evidence," (2) the EAB's application of law to facts is "based upon an irrational, illogical, or wholly unjustifiable application of law to fact," and (3) the decision is "arbitrary and capricious." *See* Iowa Code § 17A.19(10)(f), (m), (n).[4]

Substantial evidence is defined as "the quantity and quality of evidence that would be deemed sufficient by a . . . reasonable person, to establish the fact at issue." *Id.* § 17A.19(10)(f)(1). Additionally, we view the evidence through the lens of the record as a whole. *Id.* § 17A.19(10)(f)(3). The question is not whether the evidence supports a different finding, but whether the evidence supports the findings actually made by the agency. *Broadlawns Med. Ctr. v. Sanders*, 792 N.W.2d 302, 306 (Iowa 2010).

Finally, we "shall give appropriate deference to the view of the agency [regarding] matters that have been vested by a provision of law in the discretion

---

[4] In its appellant's brief, UPS also contends the EAB violated its due process rights by incorrectly applying "the Iowa General Duty Clause to the facts of this case, in essence creating a strict liability standard." UPS requests we review the record de novo. While Iowa Code section 17A.19(10)(a) allows courts to grant relief from unconstitutional agency action, UPS did not cite subsection (10)(a) as a ground for relief in its petition for judicial review, and neither the agency nor the district court addressed or resolved a due process claim. Because UPS did not preserve its due process claim, we will not address it on appeal. *See O'Hara v. State*, 642 N.W.2d 303, 314 (Iowa 2002) (reiterating error preservation is required even on constitutional issues).

of the agency." Iowa Code § 17A.19(11)(c). The EAB is clearly vested by a provision of law with the authority to interpret chapter 88 and to apply law to fact. *See id.* § 88.8(3)(b) (stating board shall act as an adjudicatory body); *see also City of Des Moines v. Emp't Appeal Bd.*, 722 N.W.2d 183, 193-94 (Iowa 2006) (applying "irrational, illogical, or wholly unjustifiable" standard of review to board's interpretation of chapter 88). Because the district court acts in an appellate capacity to correct legal error by the agency, we review the district court's decision to see if we reach the same conclusions. *City of Des Moines*, 722 N.W.2d at 189.

On appellate review of the agency's finding of violations of the general duty clause, our task is not to analyze whether a proximate cause relationship existed "between the accident which preceded the inspection and the specific violation charged, but to determine whether there is substantial evidence in the record supporting the charge that the employer maintained, at the time and place alleged, a recognized hazard to the safety of its employees." *Midwest Carbide Corp.*, 353 N.W.2d at 402-03 ("The general duty clause is violated when a recognized hazard is maintained, regardless of whether or not an injury or accident occurs.").

## III. *Analysis*

UPS challenges the EAB decision regarding the second and fourth elements under the general duty clause: recognition of a hazard and feasible

means of abatement.[5]  Specifically, UPS claims the labor commissioner failed to prove UPS or its industry recognized a hazard due to inadequate lighting or lack of training, and failed to prove a feasible means existed to eliminate or materially reduce the hazard posed by those two conditions.  UPS argues the EAB holdings were not supported by substantial evidence, were based on an irrational, illogical, and wholly unjustified application of law to fact, and were arbitrary and capricious.  Our analysis will first address lighting and then will turn to training.

### A. Inadequate lighting

To understand what UPS was expected to recognize, we must first define hazard.  In OSHA litigation, a hazard means an unsafe condition or practice in the workplace over which the employer can reasonably be expected to exercise control.  *See Nat'l Realty & Const. Co. v. OSHRC*, 489 F.2d 1257, 1265-67 (D.C. Cir. 1973) (discussing preventable hazards); *Morrison-Knudsen Co.*, 16 BNA OSHC 1105, at *19 (No. 88-572, 1993).

In this case, the EAB described the hazard posed by inadequate lighting as follows:

> The location where the accident took place is not just any place next to a roadway.  It is a restricted area from which, when things go wrong, there is no escape . . . .  We think the conditions of being required to stand between a building and a moving truck, with the lights not working, in this case makes it so this is no ordinary stroll down the sidewalk.  Given this, it takes merely poor

---

[5] In its appellant's brief, UPS also contests the EAB holding on the first element, the *existence of a hazard*.  At oral argument, UPS addressed only the second and fourth elements.  Likewise, at both the agency and the district court level, UPS limited its challenge to the second and fourth elements.  Because we do not consider issues raised for the first time on appeal, *see Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002), we will focus our analysis on whether UPS *or* its industry *recognized* the hazard and whether a feasible means of abatement existed.

truck driving skills, not freakish or utterly implausible driving, in order to have an accident at this site with the lighting that was present. Given the lack of lighting, a significant risk to employees was created and thus there was a hazard.

A "hazard is deemed 'recognized' when the potential danger of a condition or activity is either actually known to the particular employer or generally known in the industry." *Noble Drilling,* 19 BNA OHSC 1869, at *6. The employer's knowledge may be actual or constructive. *See Midwest Carbide Corp.*, 353 N.W.2d at 403 (citing Iowa Code section 88.14(11), which deems a serious violation to exist from workplace hazards "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation").

On the actual knowledge issue, the labor commissioner asserted the requirement that employees wear reflective vests, standing alone, demonstrated UPS realized the danger of poor lighting. The EAB declined to rely solely on the reflective-vest policy to find a recognized hazard. Nevertheless, the EAB concluded UPS was aware darkness posed a crushing hazard to the workers opening Gate 10:

> The fact is [UPS] required the vests to be worn at all times. This tends to support the idea that [UPS] recognized the importance of visibility for night workers at its airport facility. This does not necessarily translate into the notion that [UPS] recognized a hazard to workers unless every square foot of the facility was adequately lit. But the fact is [UPS] did light the gateway, despite the existence of headlights, for the obvious reason that darkness makes safely navigating the gate more difficult . . . . In addition, we have found credible the testimony that reliance on ambient light from the shed was not sufficient to meet recognized standards of safe lighting.

On appeal, UPS faults the EAB for failing to cite any authority showing that "having lights acknowledges recognition of a hazard." The commissioner responds the employer's provision of lights at Gate 10 acknowledges "such light reduced dangers associated with visibility in a highly trafficked, dangerous area." The commissioner also asserts even if UPS did not have actual awareness of the crushing hazard posed by the lack of lighting at Gate 10, it *should have* recognized the hazard.

Taking precautions can be a sign of recognition. *See Duriron Co. v. OSHRC*, 750 F.2d 28, 30 (6th Cir. 1984) (stating employer's recognition of the heat stress hazard was shown by taking steps to protect its employees from the dangers of heat stress); *General Electric Co.*, 10 BNA OSHC 2034, at *7 (No. 79-504, 1982) (ruling employer recognized hazard "as evidenced by its pass system, warning lights, and the fences around the berths, as well as the other precautions it has taken"). UPS took measures to keep its workers visible to incoming trucks; those measures reveal the employer's recognition of the hazard posed by poor lighting. We find substantial evidence in the record to support the EAB's conclusion that the labor commissioner satisfied the second element of the general duty clause. *See Midwest Carbide Corp.*, 353 N.W.2d at 402.[6] Further,

___

[6] Regarding the "recognition" element, UPS also claims: (1) the commissioner failed to show that "knowledgeable persons familiar with the industry would regard additional measures as necessary and appropriate in the particular circumstances existing at the employer's worksite," citing *Inland Steel Co.,* 12 BNA OSHC 1968, at *3 (No. 79-3286, 1968); and (2) there is a lack of evidence as to whether the existing lighting would have complied with the ANSI industry standard offered at trial. But, the commissioner has two alternatives methods of proving the "recognized" element. Either prove UPS had knowledge (knew or should have known the condition was hazardous) or *alternatively* prove that the condition is generally known to be hazardous in the industry. Based on

the EAB ruling was not an irrational, illogical, or wholly unjustifiable application of law to fact, nor was it arbitrary and capricious.

The fourth element for proving a violation of the general duty clause requires the commissioner to demonstrate "feasible abatement," that is, the hazard "could have been materially reduced *or* eliminated by a feasible and useful means of abatement." *Morrison-Knudsen Co.*, 16 BNA OSHC 1105, at \*19 (emphasis added). The commissioner must demonstrate "both that the [abatement] measures are capable of being put into effect and that they would be effective in materially reducing the incidence of the hazard." *Noble Drilling*, 19 BNA OSHC 1869, at \*7.

The EAB had "little trouble" in finding a feasible means to abate the crushing hazard posed by poor illumination. "The solution is obvious and simple. Make sure the lights work." Further:

> There were lights in place and all [UPS] had to do was make sure they functioned properly. With the addition of motion sensors they now function properly and thus it follows, of course, that it was feasible to make them function properly in the first place. Since the lights, functioning properly, would have alleviated the lack of lighting hazard the final element in showing a general duty violation based on a lack of lighting has been satisfied.

UPS claims it "took all steps to eliminate or materially reduce the hazard of an employee being struck by vehicular traffic—its yard control procedures and use of reflective vests served the purpose of working safely around vehicular

---

our resolution—substantial evidence shows UPS knew or should have known of the crushing hazard posed by insufficient lighting, we find it unnecessary to address UPS's arguments based on the alternative method of proof that the condition is generally known to be hazardous in the industry. *See Nelson Tree Serv.*, 60 F.3d at 1210 (stating employer's actual knowledge "is sufficient to establish that the hazard is 'recognized'").

traffic." It finds fault with the commissioner's failure to offer testimony from experts familiar with the industry that lighting would have materially reduced or eliminated the crushing hazard. Finally, UPS claims there was no evidence presented regarding how the commissioner's proposed abatement method of "making sure the lights work" would provide more protection for the employees.

We can uphold the EAB's finding of feasible abatement without direct testimony that the measures would materially reduce the recognized hazard. *See Acme Energy Servs. v. OSHRC*, 24 BNA OSHC 1197, at *366 (No. 12-60810, 5th Cir. 2013) (finding commissioner made reasonable inferences from "testimony that standing on the rig floor under a suspended load is dangerous, as well as the commonsense notion that being further away from equipment that could fall is safer"). In this case, the EAB could infer from the evidence that holding a gate open for semi-trucks in the darkness was dangerous and fixing the flood light to increase visibility would make the job safer. The feasible-abatement challenge by UPS lacks merit.

### B. Lack of training on gate procedures

The EAB found "the lack of training on how to handle the gate opening procedure created a hazard. The lack of training is what placed employees in the dangerous location by the shed in the first place, and this created a likelihood of serious physical harm." The district court agreed:

> [E]vidence on the record establishes that UPS employees were required to open Gate 10 when no guard was working. This often occurred in the early morning. Some employees would open Gate 10 and use the bungee cord to hold the gate open, while others held the gate themselves which required standing in approximately the same place in which Raber stood when struck and run over.

UPS employees testified that they received no training on the proper procedures to open Gate 10, or the proper place to stand in order to avoid possible dangerous situations. Evidence established that drivers of varying degrees of skill used Gate 10 the day before the accident.

UPS argues it provided "extensive training to all employees, especially those who worked in the yard around vehicles," and "did not have any recognition that this type of accident would occur."

As to this type of accident, the EAB found "given the prior incidents of poor driving at the gate, [UPS] through the exercise of reasonable diligence would be aware of the hazard to personnel on the ground, holding the gate, from poor driving." The EAB again cited the reflective-vests requirement and reasoned that the UPS yard safety program indicated an actual awareness on the employer's part. Also, the EAB found constructive knowledge based on the availability of bunge cords to secure the gate.

[T]he awareness is clearly established by the fact that [UPS] had the bungee cord process and that it was made an option for the workers to use to avoid standing in a dangerous location. Since [UPS] had available, and from time to time used, this safety procedure, the failure to train employees to use this safety precaution shows constructive knowledge of the hazard.

Based on the EAB's above analysis, the district court ruled substantial evidence existed to support the EAB's conclusion UPS recognized the hazard from a lack of training. We agree with the district court.

UPS claims there was no evidence presented that the training already provided its employees was insufficient. UPS again faults the commissioner for failing to introduce expert testimony to show additional training would have materially reduced or eliminated the crushing hazard.

The commissioner responds the bungee-cord abatement method is logical, simple to implement, had already been partially implemented, and would mitigate the hazard. Substantial evidence supports the EAB's reasonable conclusion that adequate training on where to stand when opening Gate 10 would abate the identified hazard.

The district court, recognizing there is no requirement that more than one feasible abatement method be shown to establish a serious general duty violation, concluded abatement by training on using the bungee cord was supported by substantial evidence. We agree with the district court and find no merit to UPS's claims on this issue.

**AFFIRMED.**